RECORD NO. 13-2437

In The

# United States Court of Appeals
### For The Fourth Circuit

**KIMBERLY SIPES, as Administrator of the Estate of M.B.S.,**

*Plaintiff – Appellee*,

**v.**

**JOHNNY D. COOPER, Individually and Officially,**

*Defendant – Appellant*,

and

**MICHAEL FERRARO, Individually and Officially; CITY OF MORGANTON**

*Defendants.*

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA AT ASHEVILLE**

———————————

**BRIEF OF APPELLANT**

———————————

James P. Cooney, III
Scott D. MacLatchie
WOMBLE CARLYLE
 SANDRIDGE & RICE, LLP
301 South College Street, Suite 3500
1 Wells Fargo Center
Charlotte, North Carolina 28202
(704) 331-4980

*Counsel for Appellant*

## UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
## DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of all parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. 13-2437    Caption: Sipes v. Cooper

Pursuant to FRAP 26.1 and Local Rule 26.1,

Johnny D. Cooper
(name of party/amicus)

who is _____Appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity? ☐ YES ☑ NO

2.    Does party/amicus have any parent corporations? ☐ YES ☑ NO
      If yes, identify all parent corporations, including grandparent and great-grandparent
      corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or
      other publicly held entity? ☐ YES ☑ NO
      If yes, identify all such owners:

4.   Is there any other publicly held corporation or other publicly held entity that has a direct
     financial interest in the outcome of the litigation (Local Rule 26.1(b))?   ☐YES ☑NO
     If yes, identify entity and nature of interest:

5.   Is party a trade association? (amici curiae do not complete this question)   ☐YES ☑NO
     If yes, identify any publicly held member whose stock or equity value could be affected
     substantially by the outcome of the proceeding or whose claims the trade association is
     pursuing in a representative capacity, or state that there is no such member:

6.   Does this case arise out of a bankruptcy proceeding?   ☐YES ☑NO
     If yes, identify any trustee and the members of any creditors' committee:

Signature: /s/Scott D. MacLatchie                    Date: _____ 12/9/13 _____

Counsel for: Appellant, Johnny D. Cooper

## CERTIFICATE OF SERVICE
***************************

I certify that on _____ 12/9/13 _____ the foregoing document was served on all parties or their
counsel of record through the CM/ECF system if they are registered users or, if they are not, by
serving a true and correct copy at the addresses listed below:

/s/Scott D. MacLatchie                              12/9/13
      (signature)                                   (date)

- 2 -

## **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES..........................................iii

STATEMENT OF JURISDICTION........................................1

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW.....................1

STATEMENT OF THE CASE............................................2

      The Evening of August 29, 2010.............................6

      The Lawsuit...............................................12

      The District Court's Order................................15

SUMMARY OF THE ARGUMENT.........................................16

ARGUMENT........................................................20

      STANDARD OF REVIEW........................................20

        I.   THE AFFIDAVITS OF BETTY STEWART, JEREMY HASTINGS, AND KIMBERLY SIPES SUBMITTED BY THE PLAINTIFF WERE INADMISSIBLE "SHAM AFFIDAVITS," SHOULD NOT HAVE BEEN CONSIDERED, AND SUMMARY JUDGMENT SHOULD HAVE BEEN GRANTED BY THE DISTRICT COURT..............21

           A.   The Affidavits Should Have Been Stricken Under the "Sham Affidavit" Doctrine...................................21

           B.   Absent the Sham Affidavits, There is No Dispute that M.S. Fired at Officer Cooper First, Making Officer Cooper's Use of Deadly Force Constitutionally and Legally Valid.........................30

        II.  Even If There is a Genuine Issue of Material Fact Over Whether M.S. Fired First, Officer Cooper is Still Entitled to Summary Judgment....36

i

CONCLUSION....................................................41

REQUEST FOR ORAL ARGUMENT.....................................42

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF FILING AND SERVICE

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Adelman-Tremblay v. Jewel Companies, Inc.*,
859 F.2d 517 (7th Cir. 1988) ...............................26

*American Hospice, Inc. v. Sebelius*,
2010 WL 9013005 (N.D. Ala. 2010).........................13

*Anderson v. Russell*,
247 F.3d 125 (4th Cir. 2001) .........................19, 38

*Ashcroft v. al-Kidd*,
-- U.S. --, 131 S. Ct. 2074,
179 L. Ed. 2d 1149 (2011)................................34

*Bailey v. Kennedy*,
349 F.3d 731 (4th Cir. 2003) ............................1

*Bank of Illinois v. Allied Signal Safety Restraint System*,
75 F.3d 1162 (7th Cir. 1996) ...........................25

*Barwick v. Celotex Corp.*,
736 F.2d 946 (4th Cir. 1984) ...........................22

*Cleveland v. Policy Mgmt. Sys. Corp.*,
526 U.S. 795, 119 S. Ct. 1597,
143 L. Ed. 2d 966 (1999).................................22

*Colantuoni v. Alfred Calcagni & Sons, Inc.*,
44 F.3d 1 (1st Cir. 1994) .........................25-26, 28

*Crawford-El v. Britton*,
523 U.S. 574, 118 S. Ct. 1584,
140 L. Ed. 2d 759 (1998).................................36

*Davis v. Scherer*,
468 U.S. 183, 104 S. Ct. 3012,
82 L. Ed. 2d 139 (1984)..................................37

*Diliberti v. United States*,
817 F.2d 1259 (7th Cir. 1987) ..........................22

*Drewitt v. Pratt*,
999 F.2d 774 (4th Cir. 1993) ..............................37

*EEE-ZZZ Lay Drain Co. v. N.C. Dept. of Human Resources*,
108 N.C. App. 24, 422 S.E.2d 338 (1992),
*overruled on other grounds*,
*Meyer v. Walls*,
347 N.C. 97, 489 S.E.2d 880 (1997).......................35

*Elliott v. Leavitt*,
99 F.3d 640 (4th Cir. 1996) .........................*passim*

*Flores v. Phoenix Group Metals, LLC*,
2013 WL 1309128 (S.D. Tex. 2013)...........................25

*Fredianelli v. Jenkins*,
931 F. Supp. 2d 1001 (N.D. Cal. 2013)....................22

*Galvin v. Eli Lilly & Co.*,
488 F.3d 1026 (D.C. Cir. 2007)...........................20

*Graham v. Connor*,
490 U.S. 386, 109 S. Ct. 1865,
104 L. Ed. 2d 443 (1989)..............................19, 31

*Holder v. State Farm Fire & Cas. Co.*,
2008 WL 3887632 (S.D. Ga. 2008).......................26, 27

*Holesapple v. Barrett*,
5 Fed. Appx. 177 (4th Cir. 2001) .........................20

*Jenkins v. Medford*,
119 F.3d 1156 (4th Cir. 1997) ............................1

*Jiminez v. All Am. Rathskeller, Inc.*,
503 F.3d 247 (3d Cir. 2007)..............................30

*Jones v. Kearns*,
120 N.C. App. 301, 462 S.E.2d 245 (1995).................36

*Lane v. Celotex Corp.*,
782 F.2d 1526 (11th Cir. 1986) ..........................26

*Luster v. Retail Credit Co.*,
575 F.2d 609 (8th Cir. 1978) ............................28

*Malley v. Briggs*,
  475 U.S. 335, 106 S. Ct. 1092,
  89 L. Ed. 2d 271 (1986).....................................34

*Matsushita Elect. Indus. Co. v. Zenith Radio Corp.*,
  475 U.S. 574, 106 S. Ct. 1348,
  89 L. Ed. 2d 538 (1986).....................................30

*McLenagan v. Karnes*,
  27 F.3d 1002 (4th Cir. 1994) ..........................38, 39

*Melgar v. Greene*,
  593 F.3d 348 (4th Cir. 2010) .............................20

*Milstead v. Kibler*,
  243 F.3d 157 (4th Cir. 2001) .............................40

*Mitchael v. Intracorp, Inc.*,
  179 F.3d 847 (10th Cir. 1999) ...........................24

*Mitchell v. Forsyth*,
  472 U.S. 511, 105 S. Ct. 2806,
  86 L. Ed. 2d 411 (1985).....................................34

*Newsome v. James*,
  2000 WL 528475 at *2 (N.D. Ill. 2000)....................26

*Powell v. Dallas Morning News, L.P.*,
  776 F. Supp. 2d 240 (N.D. Tex. 2011).....................22

*Reese v. Herbert*,
  527 F.3d 1253 (11th Cir. 2008) ..........................26

*Riley v. Allandydy*,
  2012 WL 5386566 (D. N.H. 2012),
  *recommendation of Magistrate Judge adopted*,
  2012 WL 5383389 (2012)....................................29

*Rohrbough v. Wyeth Laboratories, Inc.*,
  916 F.2d 970 (4th Cir. 1990) .....................17, 23, 24

*Scott v. Harris*,
  550 U.S. 372, 127 S. Ct. 1769,
  167 L. Ed. 2d 686 (2007)...................................28

*Sigman v. Town of Chapel Hill*,
  161 F.3d 782 (4th Cir. 1998) .............................30

*Slade v. Vernon*,
    110 N.C. App. 422, 429 S.E.2d 744 (1993)..............35, 36

*State v. Ellis*,
    241 N.C. 702, 86 S.E.2d 272 (1955).......................36

*Wiley v. Doory*,
    14 F.3d 993 (4th Cir. 1994) ...............................36

*Wilson v. Meeks*,
    52 F.3d 1547 (10th Cir. 1995) ...................19, 33, 34

**CONSTITUTIONAL PROVISION**

U.S. Const. amend. IV......................................*passim*

**STATUTES**

28 U.S.C. § 1291............................................1

42 U.S.C. § 1983............................................2

## STATEMENT OF JURISDICTION

This Court has jurisdiction pursuant to 28 U.S.C. § 1291 based on the District Court's denial of Defendant Johnny Cooper's Motion for Summary Judgment on the basis of qualified immunity, a denial that is an immediately appealable "final order." *Jenkins v. Medford*, 119 F.3d 1156, 1159 n.2 (4th Cir. 1997). This Court's jurisdiction encompasses the Defendant's claims of immunity under federal and state law. *Bailey v. Kennedy*, 349 F.3d 731, 733 (4th Cir. 2003).

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

1.    When witnesses previously told law enforcement in both written and videotaped interviews that the decedent fired his weapon before being shot by the Defendant police officer, and when these witnesses later affirm these interviews in sworn declarations, does the District Court err in permitting the Plaintiff to submit later declarations (obtained after a Motion for Summary Judgment is filed) contradicting and repudiating these earlier interviews and sworn statements so as to create a genuine issue of material fact sufficient to defeat summary judgment?

2.    When the undisputed evidence showed that the Defendant police officer, during the course of a lawful investigation late at night and while in uniform, was confronted by a person with a rifle who turned towards him in a confined space causing him to

use deadly force to protect his life and the life of his partner, does the District Court err in holding that a reasonable jury could find that this use of deadly force violated the U.S. Constitution and the law of North Carolina such that the officer was not entitled to immunity?

## STATEMENT OF THE CASE

Kimberly Sipes ("the Plaintiff") filed this wrongful death case over the shooting death of her 17 year old son, M.S.,[1] by Officer Johnny Cooper ("Officer Cooper") of the Morganton Department of Public Safety ("MPSD") on August 29, 2010. The Amended Complaint alleged wrongful death claims under 42 U.S.C. § 1983 and state law, and named as defendants Officer Cooper, Sgt. Michael Ferraro, and the City of Morganton. Following discovery, all defendants moved for summary judgment, with Officer Cooper and Sgt. Ferraro asserting entitlement to qualified immunity on the federal claim and to public official immunity on the state law claims. (JA 49).

After briefing and argument, the District Court filed a Memorandum Order and Opinion on October 28, 2013 granting the Motion for Summary Judgment as to Sgt. Ferraro but denying it as to Cooper and the City of Morganton. (JA 617). While acknowledging the City of Morganton was entitled to summary

---

[1] Because M.S. was a minor at the time of his death, by rule of this Court he will be referred to by his initials.

judgment on the "direct" claims asserted against it under both state and federal law, the District Court declined to dismiss it from the case because it could still be "vicariously liable for any wrong of Cooper the jury may find." (JA 641). Officer Cooper timely filed a Notice of Appeal to this Court on November 26, 2013. (JA 643).

The fatal shooting of M.S. occurred during the course of a lawful police investigation into a neighbor's noise complaint. There is no dispute that in the late evening of August 29, 2010, and after being dispatched to M.S.'s home in response to a call for service, Officer Cooper, after knocking on the door, was met by M.S. who was wielding a .22 caliber rifle. According to Officer Cooper, M.S. fired his weapon; Officer Cooper, in response, fired eight times, killing M.S. A spent rifle shell matching the ammunition in M.S.'s rifle was found on the ground under the front edge of the porch where M.S. had been standing. Subsequent laboratory analysis determined that the shell had been fired from M.S.'s rifle.

The North Carolina State Bureau of Investigation ("SBI") conducted an investigation into the shooting, including interviews with witnesses. One of those witnesses was M.S.'s next door neighbor, Betty Stewart, who was the person who called the police. When first interviewed in the early morning hours following the shooting, Stewart stated "the first gun she heard

belonged to [M.S.], and the others were in rapid succession following the shot fired by [M.S.]." (*See* Declaration of SBI Agent Carl Hughes authenticating summary of 8/30/10 interview with Betty Stewart) (JA 537). Two days later, during a **videotaped** interview with MPSD Capt. Joseph Blumetti, Stewart elaborated on her statement by explaining her familiarity with the sound of a .22 rifle vs. the sound of a pistol, describing the first shot that she heard as a "balloon popping," and the next shots as a "firecracker." *See* Declaration of Capt. Joseph Blumetti and accompanying clip from Stewart's videotaped 9/1/10 interview, (JA 540-542). That same day, Stewart's grandson, Jeremy Hastings, was also interviewed on videotape. Hastings indicated that he heard the gunshots, and that the first shot definitely came from a .22 rifle:

> Q.   But the first shot you said sounded different?
>
> A.   It was the .22, I ain't gonna lie.
>
> Q.   And, um, so you say the first shot was a .22.
>
> A.   Yeah.

(JA 545). Hastings continued, differentiating between the sound made by a .22 rifle versus the sound made by a .40 caliber revolver, concluding that he first heard the .22 being fired followed immediately by four "high caliber" shots. (*See* Declaration of Detective Josh Falls and accompanying clip from Hastings' videotaped 9/1/10 interview) (JA 544-546). For her

part, the Plaintiff (M.S.'s mother) told the SBI the night of the shooting that she did not know if her son had fired his rifle. (JA 140:3-5). Following the filing of this lawsuit, Stewart and Hastings signed declarations under oath affirming what they had said during their videotape interviews; while M.S.'s mother testified on deposition that what she had told the SBI was "truthful" and that while she did not know whether M.S. fired the rifle, she was prompted by her attorney to say she "think[s]" she would have seen it had he done so. (JA 98:6-11) (JA 167:23-168:1).

After Officer Cooper and the other Defendants filed a Motion for Summary Judgment, Plaintiff's counsel apparently met with Stewart and Hastings and obtained from them new declarations that contradicted their interviews (both written and videotaped) with law enforcement and their prior sworn declarations. For Plaintiff's counsel, Stewart and Hastings both declared that the .22 rifle was not fired first and that they had not read their previous sworn declarations to the contrary before signing them (no mention was made of their videotaped interviews by law enforcement). M.S.'s mother, in another affidavit obtained by Plaintiff's counsel after the Motion for Summary Judgment was filed, repudiated her interview and deposition by claiming with certainty that her son did not fire his rifle.

Counsel for the Defendants objected to the use of these affidavits to create a genuine issue of material fact about whether M.S. fired his rifle. The District Court, however, overruled counsel's objections, finding that these new affidavits created a genuine issue of material fact on this question and holding, further, that the circumstances that arose on the evening of August 29, in the light most favorable to the Plaintiff, did not justify Officer Cooper's use of deadly force.

*The Evening of August 29, 2010*

Officer Cooper was on duty in full police uniform on August 29, 2010 at approximately 11:40 p.m. when he received a radio call of an "unknown disturbance" at a trailer park located at 132 Airpark Drive. The specific location given was "Lot 2W," which referred to an individual trailer within the park. (JA 52, ¶ 2). Sgt. Ferraro was assigned the call as backup officer, and both officers drove to the park in separate marked patrol cars, arriving at about the same time. After parking their cars they walked on foot towards trailer 2W. As the officers approached a large window on the side of trailer 2W the interior appeared dark. However, as Cooper passed by the corner of the trailer and headed for the front porch, he heard what sounded like movement inside. (JA 53, ¶ 4).

Ferraro remained at the right front corner of the trailer and watched Cooper step up onto the front porch. Because

Ferraro did not know the precise nature of the disturbance call, he decided to reposition himself at the right rear corner of the trailer so he could watch the back door. (JA 60, ¶ 4). Both the front porch and right side of the trailer are depicted in two photos accompanying Cooper's declaration. (JA 57-58).

After Cooper climbed the few steps onto the front porch he stopped and listened for any sound from inside before knocking on the door. He heard movement near the door, and he also heard a man's voice and the muffled sound of a female crying off to his left towards the rear of the trailer. The sound of a female crying made him believe the radio call of an "unknown" disturbance derived from some kind of domestic argument. He then knocked on the metal front door several times with his metal flashlight. A male voice in the front room asked, "Who is it?" (JA 53, ¶ 5). Although Plaintiff disputes that Cooper announced "Police" in response, resolution of that dispute is not material to the issue of summary judgment.

Almost immediately, the front door opened outward from left to right, or, from Cooper's position facing the door, from his right to his left. Based upon his officer safety training and experience, Cooper moved with the door and stayed behind it as it opened, which meant he ended up backed into the upper left corner of the elevated porch where the porch railing met the trailer. He then heard a male voice say what he thought was

"step around," followed almost immediately by a gunshot that Cooper could tell was fired on the other side of the now open door from where he was standing. Cooper was both startled and stunned, and he immediately feared for Sgt. Ferraro, who he had last seen standing at the right front corner of the trailer. (JA 53-54, ¶ 6).

Cooper instinctively crouched down and placed his left shoulder against the door to feel for resistance on the other side. By now his Glock .40 caliber handgun was in his right hand, although he did not remember drawing it. He felt resistance against the door, and then saw the barrel of a rifle protrude past the open edge of the door, followed by a male subject, later identified as M.S. The barrel was pointed outward, and Cooper tried to see but could not tell if M.S.'s fingers were on or near the trigger. M.S. looked to his left towards where Cooper had last seen Ferraro, before turning to the right towards Cooper. As M.S. did so the barrel of the rifle turned towards Cooper as well. With the door to his left, and the porch railing and an empty fish tank to his right, Cooper had nowhere to go. From his crouched position just 2-3 feet away, Cooper fired eight shots in rapid succession at M.S.'s midsection. Significantly, Cooper estimates the time lapse between hearing the initial gunshot and firing his own gun was only 3 to 4 seconds. (JA 54, ¶ 7).

As Cooper fired, M.S. continued turning towards him, and he actually saw the rifle barrel pointed at him when M.S. moved backwards as though struck. The only words spoken during this time were Cooper telling M.S. to "drop the gun," and M.S. saying something unintelligible. At about the time Cooper stopped shooting is when he saw the rifle drop from M.S.'s hands. M.S. then went off the porch and disappeared from sight. Moving up out of his crouched position, Cooper quickly scanned the surrounding area looking for any other threats. As he stepped forward, he saw M.S. lying on his stomach on the ground adjacent to the porch. (JA 54-55, ¶ 8).

Cooper went over to M.S. and saw blood on his t-shirt and heard labored breathing. Cooper told M.S. several times to "keep breathing," even though he felt he was mortally wounded. (JA 55, ¶ 9). While this was happening, Sgt. Ferraro returned to the front of the trailer and radioed for EMS and backup. (JA 60, ¶ 5). Seeing a few people exit the trailer onto the front porch, Cooper moved to secure M.S.'s rifle before more people crowded into the scene. He therefore picked it up off the ground and handed it to Sgt. Gary Massey upon his arrival soon after that. Beyond that, Cooper did not participate any further in the collection of evidence, and he remained away from the shooting scene until being told to return to the police

9

department to await the arrival of SBI investigators. (JA 55, ¶ 9).

Among the physical evidence collected by the SBI were M.S.'s rifle and a single expended .22 shell casing on the ground underneath the edge of the front porch deck. (*See* Declarations of Gary Massey, Ryan Lander, Josh Falls, Andy Cline and Renee Mullis) (JA 62-73). Subsequent SBI lab analysis concluded the shell casing came from M.S.'s rifle. (JA 68, ¶ 4).

The SBI and MPSD investigated the shooting, interviewing Stewart, her grandson Jeremy Hastings, and Sipes. One of the critical issues that faced investigators was who fired the first shot - - M.S. or Officer Cooper. In her videotaped interview, Stewart told investigators that she recognized the sound of a .22 rifle and used to shoot .22 rifles when she was younger. When asked to describe the first shot that she heard, Stewart told investigators that it was a ".22 rifle" because a ".22 rifle makes a different sound that a police - - another gun." She informed them that she knew "the sounds of them when I hear them. . . . But as far as a gun, a pistol, it sounds different than a rifle or anything. It's just a different sound." She then said that the first shot was a "quiet" round, and the other shots were louder, similar to "a crack and then a bang, bang." She further analogized the first shot to a "balloon popping,"

with the subsequent shots sounding like a "firecracker." (JA 540-541).[2]

In his interview, Hastings was even more specific, and adamant, that the first shot came from a .22 rifle:

Q.    But you said the first shot sounded different?

A.    It was the .22.  I ain't gonna lie.

Q.    And, um, so you say the first shot was a .22?

A.    Yeah.

Q.    How do you know it was the .22?

A.    My uncle has shot - - I mean, like I said I've shot 12 gauges, 20 gauges, .22s, .17s.

Q.    Okay.  So you know from experience shooting?

A.    Yeah, I mean I know the sound of a .22.  You know how you hear cha-cha like you shoot a .22, you know, it has a specific sound.

.    .    .    .

I mean you're shooting a .22, that's about what it sounds like.  It has a little - - it has a two-part recoil, not like a kaboom like a 40.[3]

---

[2] An SBI report of their interview of Stewart shortly after the shooting indicated that "Stewart claims the first gun she heard belonged to [M.S.], and the others were in rapid succession following the shot by [M.S.]." (JA 537).

[3] Counsel submitted to the District Court, and has filed as part of the Joint Appendix, excerpts of the videotapes of these interviews where Stewart and Hastings describe the first shot as coming from a .22 rifle.

The Plaintiff, during the course of her interview, told law enforcement that her son had taken his rifle to the door and that she did not know whether he fired it. (JA 140).[4]

*The Lawsuit*

On August 29, 2012 – – the last day of the statute of limitations for wrongful death under North Carolina law – – the Plaintiff filed this lawsuit. As originally filed, the lawsuit alleged four claims – – Wrongful Death under North Carolina law (based on negligence and gross negligence), Wrongful Death under North Carolina law (based on Trespass by an Officer), a claim under the Fourth Amendment for excessive force, and a contingent claim under the Constitution of North Carolina. Officer Cooper and Sgt. Ferraro were both sued in their individual and official capacities, and the City of Morganton was sued directly for negligence and under a theory of *respondeat superior*. Two days later, the Plaintiff filed an Amended Complaint, adding the allegations that Officer Cooper and Sgt. Ferraro were being sued in their official capacities under the North Carolina Constitution, and in their official and individual capacities under the Fourth Amendment, and eliminating an allegation that the City was being sued in its official capacity. The Complaint and Amended Complaint each stated that M.S. both had a .22 rifle

---

[4] Sipes' SBI interview was not presented to the District Court by either party; this reference is to Sipes' admission on deposition that this is what she told the SBI.

and answered the door holding the .22 rile (though in a "non-threatening manner"). (JA 11 & 30, ¶ 24). Significantly, in both the original Complaint and Amended Complaint, the Plaintiff claims that M.S. did not fire the rifle at all that night, but she does so only upon "information and belief" (JA 11 & 30, ¶ 26), a reservation that means "the declarant lacks personal knowledge of the truth of the statement." *American Hospice, Inc. v. Sebelius*, 2010 WL 9013005 at *4 n.7 (N.D. Ala. 2010). On deposition, the Plaintiff affirmed that she had told the SBI that she did not know if her son had fired his rifle, that she had told the SBI the truth, and that she *still* did not know if he fired the rifle:

> Q.   But as you told the SBI, you don't know if [M.S.] fired as well; correct?
>
> A.   I don't.

(JA 140:3-5). Even on re-direct by her own attorney, the best she could say when prompted is that she "think[s]" she would have seen M.S. fire the rifle had he done so. (JA 167:23-168:1).

Following discovery, the Defendants filed a Motion for Summary Judgment on July 9, 2013. Attached to that Motion were sworn declarations by Hastings stating that "I distinctly heard one low caliber shot followed shortly thereafter by what sounded like four high caliber shots" and that he was "familiar with the sound of a .22 rifle, having shot one in the past, and that's

13

what the first gunshot sounded like" (JA 75, ¶ 3), and Stewart, stating that "I recall hearing . . . a single gunshot from what sounded like a .22 rifle. I immediately sat up in bed, and then heard what sounded like 3-4 shots from a different caliber gun. I used to shoot a .22 rifle myself, so I know what it sounds like." (JA 77, ¶ 3). Both statements were made under the penalty of perjury.

According to declarations submitted by the Plaintiff, the day after the Defendants' Motion for Summary Judgment was filed, counsel for the Plaintiff interviewed Hastings and Stewart and, eventually, provided to them sworn declarations for their signature in which both contradicted their earlier declarations, claiming that they "did not carefully read the earlier declaration before I signed it," and that it was not until Plaintiff's counsel read the earlier declaration that they reviewed it carefully. (JA 191:25-192:5; JA 530, ¶ 5).[5] Plaintiff also submitted a transcript of a portion of the interview conducted by Plaintiff's counsel with Stewart. Plaintiff further submitted her own declaration and her deposition; her declaration stated unequivocally that her son did not fire his rifle, a statement which was at odds with both her deposition (in which she affirmed what she had told law

---

[5] There is no allegation that either Hastings or Stewart cannot read or understand English.

14

enforcement earlier about not knowing whether her son had fired his rifle) and the qualified allegations of her Complaint and Amended Complaint.

In reply, the Defendants submitted the written law enforcement interview notes for Stewart (JA 536-538) as well as excerpts of the videotape of her interview (JA 542), and excerpts from the videotape of Hastings' interview (JA 546). The Defendants also objected to any consideration by the District Court of the new declarations obtained by Plaintiff's counsel on the basis that they were "sham" affidavits.

The District Court held a hearing on the Defendants' Motion for Summary Judgment on September 13, 2013. During the course of that hearing, the District Court, among other comments, suggested that the "sham affidavit" rule was limited to parties or to witnesses controlled by parties (such as retained experts) (JA 570), and suggested that the Plaintiff's statement on deposition that she did not think that her son fired first was sufficient to create a genuine issue of material fact. (JA 557).

*The District Court's Order*

On October 28, 2013, the District Court issued its Memorandum Order and Opinion, denying Officer Cooper's Motion for Summary Judgment. Analyzing the evidence in the light most favorable to the Plaintiff, the District Court found that the evidence showed that M.S. answered the door armed with a .22

rifle, but had it in a "hunter's rest" position in which his hands and fingers were not in the vicinity of the trigger (which should have been visible to Officer Cooper) and that Officer Cooper simply opened fire on M.S. In so doing, the District Court explicitly rejected application of the "sham affidavit" rule, finding that the Defendants' argument on this issue "muddied" the question of whether M.S. fired his rifle.  The District Court also indicated that the dispute about whether Cooper announced himself as a police officer and whether he gave warnings to M.S. before opening fire, could also lead a jury to conclude that he both violated M.S.'s constitutional rights under the Fourth Amendment and acted recklessly and maliciously under North Carolina law.

Officer Cooper, believing that the District Court erred in both considering the sham affidavits and in requiring under the Fourth Amendment that he not use deadly force until a rifle was turned on him (and then only after giving a warning), now appeals.

## SUMMARY OF THE ARGUMENT

The District Court committed two errors in its Order, errors which, if corrected, entitle Officer Cooper to summary judgment.

The District Court erred first by holding that the rule against the submission of sham affidavits to create issues of

16

fact did not apply to third-party witnesses, and thus that there was a genuine issue of material fact over whether M.S. fired his rifle. While the application of the rule against sham affidavits to third persons other than retained experts is an issue of first impression for this Circuit, applying this rule to the declarations here is consistent with this Court's decision in *Rohrbough v. Wyeth Labs, Inc.*, 916 F.2d 970, 976 (4th Cir. 1990), with case law from the Tenth Circuit, and is necessary to preserve the integrity of the judicial process and summary judgment. Indeed, no circuit court has ever held that the rule against sham affidavits does not apply to third party affidavits as a blanket proposition, as the District Court did in this case. Not to apply this rule to these declarations would be to encourage (and indeed make mandatory) efforts by counsel to convince witnesses to repudiate their prior statements - - no matter to whom made or under what circumstances - - in an effort to defeat summary judgment. Where, as here, witnesses consistently (and indisputably) provide one version of facts over the course of years in oral and videotaped interviews to law enforcement officers and then to attorneys (under oath), Plaintiff's counsel cannot be permitted to submit declarations repudiating these statements. This is not simply a matter of credibility; rather, it is a matter of the integrity of investigations, the oath, and ultimately the judicial process

17

itself - - witnesses should not be encouraged to blithely disclaim their prior statements and attorneys should not be given incentives to have them do so. The District Court's decision, by choosing not to apply the rule against sham affidavits to these witnesses, regrettably provides just such incentives.

The second error in the District Court's Order is that, even if the issue of who fired first is treated as a genuinely disputed fact, the undisputed facts still demonstrate that Officer Cooper, during a lawful investigation and while in uniform, was confronted by a person wielding a .22 rifle who turned the barrel towards him. Under these circumstances there is substantial precedent from this Court affording great deference to law enforcement officers in split-second judgment calls involving the use of deadly force. Neither this Court (nor any other federal circuit court) has required the officer to look and observe whether a suspect's finger is on the trigger, or to wait until the gun is pointed at him, or to exhaust non-deadly alternatives, before defending himself and the life of his partner, as the District Court effectively ruled in its Order. To the contrary, this (and other) courts have repeatedly held that an Officer, when confronted with a deadly weapon, is not required to wait until it is pointed at him to defend himself; indeed, he does not have to see a gun at all if

a suspect's behavior is reasonably perceived as life threatening. *Anderson v. Russell*, 247 F.3d 125, 131 (4th Cir. 2001) ("This Circuit has consistently held that an officer does not have to wait until a gun is pointed at the officer before the officer is entitled to take action. We have further held that an officer is not required to see an object in the suspect's hand before using deadly force."). Moreover, certainty - - at least the type of certainty imposed by the District Court - - is not required before deadly force is used. *Elliott v. Leavitt*, 99 F.3d 640, 644 (4th Cir. 1996) ("Officers need not be absolutely sure, however, of the nature of the threat or the suspect's intent to cause them harm - - the Constitution does not require that certitude precede the act of self-protection."); *Wilson v. Meeks*, 52 F.3d 1547, 1553 (10th Cir. 1995) (the law "does not require that the police officer know what is in the heart or mind of his assailant"). Had the District Court applied these principles, recognizing that in their application the "calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments - - in circumstances that are tense, uncertain, and rapidly evolving," *Graham v. Connor*, 490 U.S. 386, 396-97, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989), the motion for summary judgment should have been granted.

## ARGUMENT

## STANDARD OF REVIEW

"A district court's denial of qualified immunity is reviewed *de novo*." *Melgar v. Greene*, 593 F.3d 348, 353 (4th Cir. 2010). Courts, however, have split on the applicable standard of review for a district court's consideration of alleged sham affidavits when ruling on summary judgment. *See*, *e.g.*, *Galvin v. Eli Lilly & Co.*, 488 F.3d 1026, 1030 n.* (D.C. Cir. 2007) ("Although we have not formally addressed the standard applicable to review of a district court decision to treat an affidavit as a sham, *Pyramid* suggests the determination is part of our overall review of summary judgment and accordingly subject to *de novo* review. [citation] Similarly, the Second Circuit has implied this determination is a matter of law, while the First, Sixth, Seventh, Tenth, and Eleventh Circuits have treated this issue as an evidentiary one subject to review for abuse of discretion.") The *de novo* approach taken by the D.C. and Second Circuits appears consistent with this Circuit's recognition in *Holesapple v. Barrett*, 5 Fed. Appx. 177, 180 (4th Cir. 2001), that "we must perform a *de novo review* of the record below to determine 'whether the plaintiff has proffered sufficient proof, *in the form of admissible evidence*, that could carry the burden of proof of [her] claim at trial." (emphasis added). Consequently, the Appellant believes that *de novo* review

of this legal issue is appropriate, though under either standard it is plain that the declarations offered by the Plaintiff in this case should not have been considered by the District Court.

I. **THE AFFIDAVITS OF BETTY STEWART, JEREMY HASTINGS, AND KIMBERLY SIPES SUBMITTED BY THE PLAINTIFF WERE INADMISSIBLE "SHAM AFFIDAVITS," SHOULD NOT HAVE BEEN CONSIDERED, AND SUMMARY JUDGMENT SHOULD HAVE BEEN GRANTED BY THE DISTRICT COURT**

A. **The Affidavits Should Have Been Stricken Under the "Sham Affidavit" Doctrine**

Officer Cooper's Motion for Summary Judgment was electronically filed and served on July 9, 2013. ***The very next day***, Plaintiff's counsel interviewed Betty Stewart, tape-recording a portion of that interview (but not all of it). (JA 176, ¶ 2; JA 178). Based upon this partial tape-recording, and just prior to the date on which the Plaintiff's response to the Motion for Summary Judgment was due, he met again with Stewart and had her sign a Declaration attesting to the truthfulness of what she said during the July 10 "interview." (JA 177). Thereafter, Plaintiff's counsel obtained a Declaration from Stewart's grandson, Jeremy Hastings, also contradicting his videotaped police interview and his earlier declaration. (JA 529).

Under the sham affidavit doctrine, "a party cannot create a genuine issue of fact sufficient to survive summary judgment simply by contradicting his or her own previous sworn statement . . . without explaining the contradiction or attempting to resolve the disparity." *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 806, 119 S. Ct. 1597, 143 L. Ed. 2d 966 (1999). The doctrine applies to all prior testimony, whether given at deposition or in writing. *See*, *e.g.*, *Diliberti v. United States*, 817 F.2d 1259, 1263 (7th Cir. 1987) (prior sworn written statement). Sham affidavits are inadmissible, and should not be considered when evaluating a party's entitlement to summary judgment. *See*, *e.g.*, *Fredianelli v. Jenkins*, 931 F. Supp. 2d 1001, 1009 (N.D. Cal. 2013) (declaration testimony qualifying as a "sham affidavit" is "inadmissible"); *Powell v. Dallas Morning News, L.P.*, 776 F. Supp. 2d 240, 282 (N.D. Tex. 2011) ("a sham affidavit [] is not admissible"). As noted by this Court in *Barwick v. Celotex Corp.*, 736 F.2d 946, 960 (4th Cir. 1984):

> "If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact." A genuine issue of material fact is not created where the only issue of fact is to determine which of the two conflicting versions of the plaintiff's testimony is correct.

(citations omitted).

While originally arising in the context of a party attempting to change prior statements or testimony, the sham affidavit doctrine has been applied outside this narrow context. Thus, in *Rohrbough v. Wyeth Laboratories, Inc.*, 916 F.2d 970 (4th Cir. 1990), this Court extended this rule to expert witnesses, including experts who were also fact witnesses. *Rohrbough* involved a claim for developmental retardation and seizures allegedly caused by the DPT vaccine. The minor plaintiff's treating physician, and two retained experts, testified on deposition that they could not state with a reasonable degree of medical certainty that the DPT vaccine caused this injury or what the precise cause of the injury was. When the defendant moved for summary judgment the plaintiff, in response, attached an affidavit from one of the experts which unequivocally stated that the DPT vaccine was the cause of the neurological injuries. The District Court disregarded the affidavit, granting summary judgment. This Court affirmed noting that the District Court "was left not with a genuine issue of material fact, but with trying to determine which of several conflicting versions of Dr. Cox's testimony was correct." 916 F.2d at 976. It continued: "We agree with the district court that it [the affidavit] 'may not represent the considered opinion of the doctor himself, but rather an effort on the part of the plaintiffs to create an issue of fact.'" *Id.*

The District Court was cited to, and explicitly distinguished, this Court's decision in *Rohrbough*, reasoning that an expert witness retained by a party was the functional equivalent of the party herself, rather than a disinterested third party. However, a number of courts have explicitly applied this rule to such "disinterested" witnesses, and, significantly, no circuit court has categorically held that the sham affidavit rule does not apply to such witnesses. Moreover, it is difficult to understand how the policy that led to the creation of the sham affidavit rule, and to this Court's application of the rule to witnesses other than the direct parties, has less applicability to third-party witnesses. The action barred - - having attorneys secure contrary affidavits to create issues of material fact in order to avoid summary judgment - - and the consequences - - sham affidavits that infect the integrity of the judicial process and "greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact" - - are no different whether the affidavit comes from a party or is procured by a party from a third party witness. Neither should be sufficient to create a genuine issue of fact since a genuine issue of fact cannot be created when a court is dealing with two different versions of fact from the same witness. Thus, in *Mitchael v. Intracorp, Inc.*, 179 F.3d 847, 855 (10th Cir. 1999), the Tenth Circuit held

the plaintiff's submission of an affidavit by a former employee of the defendant was nothing more than "'an attempt to create a sham issue of fact'" where the former employee averred that he now remembered meetings which he said he could not recall on deposition. As one district court recently noted, "the rationale for the [sham affidavit] doctrine should be extended to affidavits of third-parties submitted by the nonmovant on summary judgment." *Flores v. Phoenix Group Metals, LLC*, 2013 WL 1309128 at *1 (S.D. Tex. 2013). The court continued:

> [Unless the sham affidavit rule is applied to third-party witnesses], parties would have a perverse incentive to file fact witness affidavits that directly conflict with that witness's prior testimony, with full knowledge that the rule otherwise prevents parties from doing so as to their own affidavits or those of their testifying experts. The court cannot sanction such a loophole that would swallow the logical force of the sham affidavit doctrine.

*Id.*

To be sure, other courts have struggled with the application of the sham affidavit rule to third parties, seeking to avoid situations in which "'every failure of memory or variation in a witness's testimony [is] to be disregarded as a sham,'" while nonetheless acknowledging the "countervailing need to ensure that the salutary purposes of summary judgment are not undermined." *Bank of Illinois v. Allied Signal Safety Restraint System*, 75 F.3d 1162, 1170 (7th Cir. 1996) (striking affidavits of mother and step-father of plaintiff). *See also Colantuoni v.*

25

*Alfred Calcagni & Sons, Inc.*, 44 F.3d 1, 4-5 (1st Cir. 1994)(striking affidavit of "interested" witness); *Reese v. Herbert*, 527 F.3d 1253, 1270 n.28 (11th Cir. 2008) ("we have never squarely addressed whether, and in what circumstances, a district court may disregard the affidavit of a non-party that is inherently inconsistent with deposition testimony given by the non-party previously in the same case"); *Lane v. Celotex Corp.*, 782 F.2d 1526, 1531 (11th Cir. 1986) ("[W]hile a district court may find that a *party's* contradictory affidavit constitutes a sham [ ], we would be unable, absent great trepidation, to affirm a similar finding with respect to a disinterested *witness'* contradictory affidavit . . . . We need not decide [this]."); *Holder v. State Farm Fire & Cas. Co.*, 2008 WL 3887632 at *5 n.6 (S.D. Ga. 2008) (striking affidavit of third party witness who was "more than a disinterested witness to the matter" when submitted solely "to create a genuine issue of material fact where there is not one"); *compare*, *Newsome v. James*, 2000 WL 528475 at *2 (N.D. Ill. 2000) (predicting the Seventh Circuit would not extend the rule to third party witnesses as discrepancies raise only questions of credibility that must be decided by a jury) *with Adelman-Tremblay v. Jewel Companies, Inc.*, 859 F.2d 517, 521 (7th Cir. 1988) ("The purpose of summary judgment motions . . . is served by a rule that

prevents a party from creating issues of credibility by allowing one of its witnesses to contradict his own prior testimony.").[6]

The sham created by permitting the late affidavits in this case to create an issue in conflict is apparent. For example, consider the fact that *less than 72 hours after the shooting*, Jeremy Hastings stated unequivocally, *on videotape*, that the first shot definitely came from a .22 rifle.

> Q. But the first shot you said sounded different?
>
> A. It was the .22, I ain't gonna lie.
>
> Q. And, um, so you say the first shot was a .22.
>
> A. Yeah.

(JA 545-546). The video clip continues with Hastings differentiating between the sounds of a .22 discharge vs. a .40 caliber discharge, and concludes with him reaffirming he first heard the .22 being fired followed immediately by four "high

---

[6] While counsel for the Plaintiff submitted only a portion of his conversation with Stewart, during the course of that conversation Stewart expressed remorse over the fact that her telephone call to police led to M.S.'s death. ("I made the call that cost that boy his life.") (JA 211). It is a fair inference that the real reason behind Stewart's change of testimony (and likely that of her grandson) was to atone for calling the police to M.S.'s residence, thereby initiating the series of actions that led to his death and this lawsuit. This inference means that neither Stewart nor her grandson are the types of "disinterested" witnesses referred to by those courts hesitant to apply the sham affidavit rule. *See, e.g., Holder*, 2008 WL 3887632 at *5 n.6 ("Here, Johnson is more than a disinterested witness to the matter. He has a motive, whether emotional or financial, to stay in the good graces of Holder . . . .").

caliber" shots.[7]  Hastings then reaffirmed his interview
statements in the declaration submitted with Officer Cooper's
Motion for Summary Judgment.   Thus, Hastings having declared to
law enforcement on videotape that "I ain't gonna lie," and
having affirmed this in a sworn declaration, the District Court
considered a later filed declaration that was completely at odds
with these statements.   Hastings' proffered excuse - - that he
had not read his February 2013 declaration before signing it - -
is patently disingenuous, ignores the fact that his videotaped
statement was identical to the sworn declaration that he now
contradicts, and cannot be sufficient to sustain this dramatic
change in his testimony.  *See Colantuoni v. Alfred Calcagni &
Sons*, 44 F.3d at 4-5 (the non-moving party must provide "a
satisfactory explanation of why the testimony is changed").

     Moreover, and aside from the "sham affidavit" context, the
Supreme Court has admonished courts to ignore testimony offered
to defeat summary judgment that is contradicted by videotaped
evidence. *Scott v. Harris*, 550 U.S. 372, 380, 127 S. Ct. 1769,
167 L. Ed. 2d 686 (2007) ("When opposing parties tell two

---

[7] This is not hearsay because it is offered only to show each
witness's February 2013 Declaration testimony is consistent with
what they told investigators right after the shooting.  *Luster
v. Retail Credit Co.*, 575 F.2d 609, 615 (8th Cir. 1978) ("The
testimony objected to by the defendant was not hearsay because
it was not admitted to prove the truth of the matter asserted.
It was admitted solely to prove the fact that the words were
said.")

different stories, one of which is blatantly contradicted by the [videotape] record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."). Notably, *Scott's* rationale has been applied to the exact situation presented here, where a witness's declaration testimony is contradicted by a prior videotaped interview. *Riley v. Allandydy*, 2012 WL 5386566 at *5 n.4 (D. N.H. 2012), *recommendation of Magistrate Judge adopted*, 2012 WL 5383389 (court disregarded excessive force plaintiff's declaration testimony that he ran from federal agents staking out his neighbor's property because he mistook them as armed turkey hunters since it conflicted with plaintiff's prior recorded interview in which he admitted running towards his neighbor's house repeatedly yelling, "Ed, they're here").

The District Court also erred in crediting Plaintiff's opposing declaration stating unequivocally that "[M.S.] did not fire his .22 that night" (JA 481, ¶ 24), in the face of her interview with the SBI in which she said that she did not know if M.S. fired his rifle and her testimony on deposition three years later that she had been truthful when she made that statement to the SBI, and still did not know if M.S. fired his rifle. (JA 140:3-5). Even on re-direct from her own attorney, the best the Plaintiff could say on deposition is that she

29

"think[s]" she would have seen M.S. fire the rifle had he done so. (JA 167:23-168:1). Indeed, as of the filing of her Complaint and Amended Complaint, the Plaintiff was so unsure of her claim that M.S. did not fire his rifle that she made the allegation only upon information and belief. Significantly, this was the *only* factual allegation describing M.S.'s conduct in either complaint that was qualified upon information and belief.

Where, as here, "it is clear that an affidavit is offered solely for the purpose of defeating summary judgment, *it is proper for the trial judge to conclude that no reasonable jury could accord that affidavit evidentiary weight and that summary judgment is appropriate.*" *Jiminez v. All Am. Rathskeller, Inc.*, 503 F.3d 247, 253 (3d Cir. 2007) (emphasis added). This is in keeping with the Supreme Court's admonition that there can be no "genuine issue for trial" where "the record as a whole" could not lead a rational jury to find for the non-moving party. *Matsushita Elect. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).

> **B.    Absent the Sham Affidavits, There is No Dispute that M.S. Fired at Officer Cooper First, Making Officer Cooper's Use of Deadly Force Constitutionally and Legally Valid**

In *Sigman v. Town of Chapel Hill*, 161 F.3d 782 (4th Cir. 1998), this Court framed the legal analysis applicable to claims under the Fourth Amendment for excessive force as follows:

In the case where a plaintiff alleges that a police officer has unconstitutionally used deadly force, the officer's actions are judged on a standard of objective reasonableness. [citation] And in determining objective reasonableness, the court must consider what a "reasonable officer on the scene" would have done, taking into account such factors as "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." [citation] *This evaluation is guided by the pragmatic considerations of the moment and not by those that can be hypothesized from an armchair.*

*Id.* at 786-87 (emphasis added).

The standard of "objective reasonableness" used by this Court in *Sigman* was derived from the Supreme Court's decision in *Graham v. Connor*, 490 U.S. 386, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989). In *Graham*, the Supreme Court stated that "the 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397. To that end, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments - - in circumstances that are tense, uncertain, and rapidly evolving - - about the amount of force that is necessary in a particular situation." *Id.* at 396-97.

31

Here, Officer Cooper was faced with the quintessential split-second judgment call: a person who had just fired a rifle, possibly at a fellow officer, was now swinging the barrel of the rifle towards him. Indeed, the criticality of this to the Plaintiff's case is seen by the efforts made by the Plaintiff to avoid this fact – – these efforts indicate that even the Plaintiff knows that if M.S. fired first, there is no claim.

In *Elliott v. Leavitt*, 99 F.3d 640 (4th Cir. 1996), this Court reversed the denial of summary judgment to two police officers who opened fire on a handcuffed DUI suspect after he pointed a handgun at them from the front seat of a patrol car. Although the suspect never fired a shot, and although the officers, who were standing outside the patrol car at the time, possibly could have moved out of harm's way, the Court underscored the deadly threat they nonetheless faced.

> Appellees suggest that Elliott did not pose a real threat to the officers, noting that his hands were handcuffed behind his back, that he was placed in the front passenger seat with the seatbelt fastened and the window up, and that the officers were outside the car at the time of the shooting. Such a conclusion, however, is untenable in light of uncontroverted evidence that immediately before firing, Leavitt and Cheney confronted an intoxicated individual pointing a gun at them from only a few feet away with his finger on the trigger. The car window was no guarantee of safety when the pointed gun and the officers at whom it was aimed were in such close proximity.

32

*Id.* at 642. Here, Officer Cooper found himself three feet away from the barrel of a rifle that had been fired just seconds before, with nowhere to go. In that split-second moment, Cooper was not required to engage in even the slightest hesitation to see what might happen next.

> [T]he Fourth Amendment does not require omniscience. Before employing deadly force, police must have sound reason to believe that the suspect poses a serious threat to their safety or the safety of others. *Officers need not be absolutely sure, however, of the nature of the threat or the suspect's intent to cause them harm—the Constitution does not require that certitude precede the act of self protection.*

*Id.* at 644 (emphasis added).

Directly at odds with this passage from *Elliott* is the District Court's suggestion that Cooper should have interpreted M.S. shooting first as simply his act of "firing off a warning shot for the protection of hearth and home," and therefore held his fire. (JA 637 n.3). However, the only permissible legal focus in this circumstance is on what *Cooper* reasonably perceived, not what M.S. was trying to accomplish by coming onto the porch with a rifle and firing it. The Tenth Circuit well illustrated this point in *Wilson v. Meeks*, 52 F.3d at 1553:

> Plaintiffs have erroneously cast this factual dispute as an inquiry into whether Mr. Wilson was surrendering. They point out that he had backed up as Officer Meeks directed, and that he was "quivering" and not holding his gun horizontal and perpendicular to the ground. Perhaps Mr. Wilson intended to surrender. If so, his death is particularly tragic.

33

> However, the inquiry here is not into Mr. Wilson's
> state of mind or intentions, but whether, from an
> objective viewpoint and taking all factors into
> consideration, Officer Meeks reasonably feared for his
> life. *Qualified immunity does not require that the
> police officer know what is in the heart or mind of
> his assailant.* It requires that he react reasonably
> to a threat.

(emphasis supplied). As the *Wilson* court further observed, "it is hard to imagine that pointing a .357 magnum *in any direction* would not cause a reasonable police officer to fear for someone's life - - if not his own, then the life of a bystander or the gunman himself." *Id.* (emphasis added).

Therefore, since Cooper's split-second decision to defend himself with deadly force was not "clearly proscribed" by existing law, he is entitled to qualified immunity. *Mitchell v. Forsyth*, 472 U.S. 511, 528, 105 S. Ct. 2806, 86 L. Ed. 2d 411 (1985). *See also Ashcroft v. al-Kidd*, -- U.S. --, 131 S. Ct. 2074, 2083, 179 L. Ed. 2d 1149 (2011) (an officer is entitled to qualified immunity unless "'every reasonable official would have understood that what he [was] doing'" violated the Constitution); *Malley v. Briggs*, 475 U.S. 335, 341, 106 S. Ct. 1092, 89 L. Ed. 2d 271 (1986) (qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law").

A similar analysis applies to the Plaintiff's claims under North Carolina law. As a public official, under North Carolina law Cooper is entitled to public official immunity and thus can be liable only if his actions were "corrupt, malicious or outside the scope of his official duties":

> The general rule is that a public official is immune from personal liability for mere negligence in the performance of his duties, but he is not shielded from liability if his alleged actions were corrupt or malicious or if he acted outside and beyond the scope of his duties.

*Slade v. Vernon*, 110 N.C. App. 422, 428, 429 S.E.2d 744, 747 (1993). Significantly, Cooper is presumptively entitled to public official immunity unless Plaintiff establishes otherwise. *EEE-ZZZ Lay Drain Co. v. N.C. Dept. of Human Resources*, 108 N.C. App. 24, 29-30, 422 S.E.2d 338, 342 (1992) (applying "the presumption that the actions a public officer takes in the performance of his duties are regular and made in good faith [making it] the plaintiff's burden to allege and forecast evidence tending to prove otherwise"), *overruled on other grounds*, *Meyer v. Walls*, 347 N.C. 97, 107, 489 S.E.2d 880, 886 (1997).

It is not enough that the First Amended Complaint alleges Cooper acted maliciously and that his conduct amounted to gross negligence (JA 26-27, ¶¶ 8 & 9), as "[m]ere allegations of malice" cannot defeat public official immunity. *Slade v.*

*Vernon*, 110 N.C. App. at 428; 429 S.E.2d at 747. Moreover, even "[a]llegations of 'reckless indifference' are not sufficient to satisfy [a] plaintiff's burden to allege and forecast evidence of corruption or malice. [citation]" *Jones v. Kearns*, 120 N.C. App. 301, 306, 462 S.E.2d 245, 248 (1995). Where, as here, there is no evidence that an officer acted maliciously, corruptly, or outside the scope of his duties in making a split second judgment call in a very tense situation, public official immunity protects this decision as a matter of law. *See also State v. Ellis*, 241 N.C. 702, 705, 86 S.E.2d 272, 274 (1955) ("as bearing on the question of excessive force, a peace officer acting in self-defense is presumed to have acted in good faith").

## II. Even If There is a Genuine Issue of Material Fact Over Whether M.S. Fired First, Officer Cooper is Still Entitled to Summary Judgment

The doctrine of "[q]ualified immunity shields a government official from liability for civil monetary damages if the officer's 'conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Wiley v. Doory*, 14 F.3d 993, 995 (4th Cir. 1994). Notably, it is the plaintiff's burden to overcome a defendant's presumptive entitlement to qualified immunity. *Crawford-El v. Britton*, 523 U.S. 574, 589, 118 S. Ct. 1584, 1592 (1998) (plaintiff bears the "burden of proving a constitutional

violation"); *Davis v. Scherer*, 468 U.S. 183, 197, 104 S. Ct. 3012, 82 L. Ed. 2d 139 (1984) ("A plaintiff who seeks damages for violation of constitutional or statutory rights may overcome the defendant official's qualified immunity only by showing that those rights were clearly established at the time of the conduct at issue.")

The undisputed evidence is that Cooper was answering a call of an "unknown disturbance" at a trailer park shortly before midnight. After stepping up onto the front porch, he heard movement on the other side of the door, plus the sound of a female crying and an "authoritative" male voice towards the back of the trailer. (JA 330:16-24). Cooper therefore believed the "unknown" disturbance was actually a domestic disturbance, and that his immediate intervention was required. (JA 407:1-408:23).

Although a factual dispute exists over whether Officer Cooper announced "Police" after knocking on the door, that dispute does not dictate the outcome, even if it is assumed that Cooper did not announce himself. *See Drewitt v. Pratt*, 999 F.2d 774, 780 (4th Cir. 1993) (officer's failure to sufficiently identify himself "is irrelevant to the issue of whether *at the moment of the shooting* [he] had probable cause to believe [he faced] a threat of death or serious bodily harm") (emphasis added). This is so because the inquiry into whether Officer Cooper used reasonable force is made as of ***the moment Cooper***

37

*fired* and is not based on actions that he could have taken earlier which might (or might not) have led to a different outcome. If a reasonable officer in Cooper's position standing on that porch that night as M.S. swung a .22 rifle in his direction could have reasonably feared for his life, then Cooper cannot be liable. Certainly, the Plaintiff presented no evidence to the contrary sufficient to meet her burden. Perhaps the person looking around the door with a rifle barrel angled toward Officer Cooper's crouched position knew about or was involved in the perceived domestic disturbance and was expecting the police; perhaps not. But under those circumstances, lasting no more than 3 to 4 seconds (JA 54, ¶ 7), Officer Cooper was not required to hesitate before using deadly force in self-defense. *See*, *e.g.*, *McLenagan v. Karnes*, 27 F.3d 1002, 1007 (4th Cir. 1994) ("we do not think it wise to require a police officer, in all instances, to actually detect the presence of an object in a suspect's hands before firing on him"). Notably, whereas the officer in *McLenagan* simply suspected that McLenagan *might* possess a firearm, M.S. was visibly brandishing a rifle. *See also Anderson v. Russell*, 247 F.3d 125, 131 (4th Cir. 2001) ("This Circuit has consistently held that an officer does not have to wait until a gun is pointed at the officer before the officer is entitled to take action."); *Elliott v. Leavitt*, 99 F.3d at 643 ("The Fourth Amendment does not require police officers to wait until a

suspect shoots to confirm that a serious threat of harm exists.").

In its Order, the District Court described the trailer as a "calm, suspicionless setting," which could allow a jury to find Officer Cooper's decision to stay behind the door as it opened to be "objectively unreasonable." (JA 633). This characterization ignores what Cooper heard and perceived before the door was opened. More importantly, and again, it erroneously focuses on the officer's pre-seizure conduct to dictate the constitutional outcome. As this Court noted in *Elliott v. Leavitt*, 99 F.3d 640 at 642, "*Graham* requires us to focus *on the moment* force was used; conduct prior to that moment is not relevant in determining whether an officer used reasonable force." (emphasis added). Also problematic is the suggestion that Cooper should have first "announce[d] his presence" before shooting as he had "ample opportunity to warn" M.S. (JA 633-634). The "ample opportunity to warn" characterization is curious given that even the Plaintiff herself admits "that from the time [M.S.] pushed open the door until the shooting stopped was just all a few seconds." (JA 142:21-24). *See also McLenagan v. Karnes*, 27 F.3d at 1007 (rejecting the notion that "in order to avoid civil liability, an officer must always warn his suspect before firing").

39

The District Court's Order also places undue emphasis on Plaintiff's testimony M.S. did not have his hand on the trigger housing when he was shot. (JA 627-628). But as this Court has repeatedly made clear, when assessing the reasonableness of a police officer's use of deadly force on a motion for summary judgment, the focus is not on the "actual facts," but rather on what the officer reasonably perceived.

> An officer's use of force is "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," allowing for the fact that "police officers are often forced to make split-second judgments - - in circumstances that are tense, uncertain, and rapidly evolving - - about the amount of force that is necessary in a particular situation." [citation] Thus, the objective facts "must be filtered through the lens of the officer's perceptions at the time of the incident in question." [citation] *This "limits second-guessing the reasonableness of actions with the benefit of 20/20 hindsight" and "limits the need for decision-makers to sort through conflicting versions of the 'actual' facts, and allows them to focus instead on what the police officer reasonably perceived."*

*Milstead v. Kibler*, 243 F.3d 157, 163 (4th Cir. 2001) (emphasis added).

Officer Cooper testified that in the split second before he decided to shoot he tried but was unable to see if M.S. had his finger on the trigger as the barrel turned towards him. (JA 54, ¶ 7). In the exigency of the moment as reasonably perceived by Officer Cooper, from *his* vantage point, and even without M.S. shooting first, a reasonable officer in his position could have

40

believed deadly force was a necessary and lawful response. That being so, he was, and remains, entitled to summary judgment as a matter of law.

## CONCLUSION

The opposing declarations of Betty Stewart and Jeremy Hastings are more than just patent shams. Rather, by blithely repudiating what each had told law enforcement years earlier both orally and on videotape, and then had previously reaffirmed under oath in earlier declarations, these sham declarations make a mockery of the investigative and judicial process. If permitted to stand and be used to defeat a valid motion for summary judgment, this would encourage counsel to wage war on the truth with affidavits created solely for the purpose of avoiding judicial determinations. No court should permit any consideration of a statement made three years following an event that drastically changes what the witness told others within ***three days*** of the event, and which remained the witness's testimony for nearly two and one half years when it was reaffirmed ***under oath***. The same can be said for Plaintiff's own opposing declaration in which she contradicted her deposition testimony that she did not know if the .22 rifle was fired to now say it definitely was not.

On the merits the District Court erred in holding Officer Cooper to a standard of certainty not required by the Fourth

41

Amendment.  Ruling that Cooper must undergo a jury trial because he may have misunderstood M.S.'s subjective intent, or because he failed to confirm whether M.S.'s finger was on the trigger, ignores both Circuit precedent and renders toothless the protection of qualified immunity. In the process, it necessarily opens the good-faith split second decisions of law enforcement officers under uncertain and potentially life-threatening conditions to the very armchair analysis that this Court has previously disavowed.   While in this case M.S. may have misunderstood what Officer Cooper was doing or was there for, placing the burdens set forth in the District Court Order on law enforcement officers throughout this Circuit will do nothing more than to make an already dangerous job even more so.

### REQUEST FOR ORAL ARGUMENT

The District Court's refusal to apply the rule against sham affidavits to sham affidavits presented by a party from nonparty witnesses is an issue of first impression in this Circuit. Authoritative resolution of the issue is essential to ensure the integrity of not only the procedure governing summary judgment, but also the integrity of the judicial process itself.

Respectfully submitted,

/s/ Scott D. MacLatchie
James P. Cooney, III
Scott D. MacLatchie
Womble Carlyle
    Sandridge & Rice, LLP
301 South College Street, Suite 3500
1 Wells Fargo Center
Charlotte, North Carolina  28202
(704) 331-4980

*Counsel for Appellant*

**<u>CERTIFICATE OF COMPLIANCE</u>**

1.   This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because:

[      ] this brief contains [*state the number of*] words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

[  X  ] this brief uses a monospaced typeface and contains [*1,101*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.   This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

[      ] this brief has been prepared in a proportionally spaced typeface using [*state name and version of word processing program*] in [*state size and name of font*]; or

[  X  ] this brief has been prepared in a monospaced typeface using [*Microsoft Word 2007*] with [*10 inch per character Courier New Font*].

Dated: <u>January 21, 2014</u>                <u>/s/ Scott D. MacLatchie  </u>
                                         *Counsel for Appellant*

## <u>CERTIFICATE OF FILING AND SERVICE</u>

I hereby certify that on this 21st day of January, 2014, I caused this Brief of Appellant and Joint Appendix to be filed electronically with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF users:

> Charles Sasser
> Sasser Law Firm, PA
> 1011 East Morehead Street, Suite 350
> Charlotte, North Carolina  28204
> (704) 342-4200
>
> *Counsel for Appellee*

I further certify that on this 21st day of January, 2014, I caused the required copies of the Brief of Appellant and Joint Appendix to be hand filed with the Clerk of the Court.

/s/ Scott D. MacLatchie
*Counsel for Appellant*
