**RECORD NO. 13-2437**

In The

# United States Court Of Appeals For The Fourth Circuit

## KIMBERLY SIPES,
## as Administrator of the Estate of M.B.S.,

*Plaintiff – Appellee,*

v.

## JOHNNY D. COOPER, individually and officially,

*Defendant – Appellant,*

and

## MICHAEL FERRARO, individually and officially;
## CITY OF MORGANTON,

*Defendants.*

### ON APPEAL FROM THE UNITED STATES DISTRICT COURT
### FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### AT ASHEVILLE

_____

### BRIEF OF APPELLEE

_____

**Charles McB. Sasser**
**THE SASSER LAW FIRM, P.A.**
**1011 East Morehead Street**
**Suite 350**
**Charlotte, NC  28204**
**(704) 342-4200**

*Counsel for Appellee*

*Gibson*Moore Appellate Services, LLC
421 East Franklin Street  ♦  Suite 230  ♦  Richmond, VA  23219
804-249-7770  ♦  www.gibsonmoore.net

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. __13-2437__    Caption: SIPES V. COOPER, ET AL.

Pursuant to FRAP 26.1 and Local Rule 26.1,

KIMBERLY SIPES, as Administrator of the Estate of Michael Blake Sipes
(name of party/amicus)

who is _____appellee_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO

2.    Does party/amicus have any parent corporations?  ☐ YES ☑ NO
      If yes, identify all parent corporations, including grandparent and great-grandparent
      corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or
      other publicly held entity?  ☐ YES ☑ NO
      If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?    ☐ YES ☑ NO
If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)    ☐ YES ☑ NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?    ☐ YES ☑ NO
If yes, identify any trustee and the members of any creditors' committee:

Signature: _____    Date: 12/4/13

Counsel for: Kimberly Sipes

## CERTIFICATE OF SERVICE
****************************

I certify that on 12/4/13 the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

Scott Douglas MacLatchie
smaclatchie@wcsr.com
Womble Carlyle Sandridge & Rice
301 S. College Street, Suite 3500
Charlotte, NC 28202

_____    12/4/13
(signature)                         (date)

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES..........................................iii

STATEMENT OF JURISDICTION......................................1

STATEMENT OF THE ISSUES.......................................2

STATEMENT OF THE CASE.........................................3

SUMMARY OF THE ARGUMENT......................................11

ARGUMENT....................................................13

    STATEMENT OF THE APPLICABLE STANDARD FOR REVIEW..........13

    I.    DEFENDANT COOPER IS NOT ENTITLED TO QUALIFIED
        IMMUNITY TO SHIELD HIM FROM LIABILITY FOR THE USE
        OF EXCESSIVE DEADLY FORCE...........................13

        a.    Overview of 1983 Claims and the Qualified
            Immunity Defense..............................13

        b.    Defendant Cooper is not entitled to
            qualified immunity because his use of
            excessive deadly force was objectively
            unreasonable and violated Plaintiff's Fourth
            Amendment rights..............................15

        c.    Cooper is not entitled to qualified immunity
            because the unreasonable use of deadly force
            was "clearly established" as
            unconstitutional at the time he fatally shot
            Michael.......................................20

    II.  APPELLANT'S "SHAM AFFIDAVIT" ARGUMENT IS A "RED
        HERRING" NOT PROPERLY BEFORE THIS COURT..............21

    III. EVEN IF THE COURT CONSIDERS THE "SHAM AFFIDAVIT"
        DOCTRINE, IT HAS NO APPLICATION TO THE AFFIDAVITS
        AT ISSUE.............................................22

    IV.  DEFENDANT COOPER IS NOT ENTITLED TO PUBLIC
        OFFICIAL IMMUNITY TO SHIELD HIM FROM VIOLATING
        STATE LAW............................................29

CONCLUSION.................................................30

REQUEST FOR ORAL ARGUMENT..................................30

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF FILING AND SERVICE

## TABLE OF AUTHORITIES

**Pages**

**Cases**

*Anderson v. Russell*,
   247 F. 3d 125 (4th Cir, 2001) ...............................15

*Bailey v. Kennedy*,
   349 F.3d 731 (4th Cir. 2003) ...........................*passim*

*Black & Decker Corp. v. United States*,
   436 F.3d 431 (4th Cir. 2006) ..............................27

*Clem v. Corbeau*,
   284 F.3d 543 (4th Cir. 2001) ..........................15, 16

*Cooper v. Sheehan*,
   735 F.3d 153 (4th Cir. 2013) ..........................*passim*

*Diliberti v. United States*,
   817 F.2d 1259 (7th Cir. 1987) .........................26-27

*Elliot v. Leavitt*,
   99 F. 3d 640 (4th Cir. 1996) .....................15, 18, 19

*Graham v. Connor*,
   490 U.S. 386 (1989) .......................................15

*Hernandez v. Trawler Miss Vertie Mae, Inc.*,
   187 F.3d 432 (4th Cir. 1999) ...................12, 22, 27

*Hope v. Pelzer*,
   536 U.S. 730 (2002) .......................................20

*Johnson v. Jones*,
   515 U.S. 304 (1995) ...................................*passim*

*Jones v. Buchanan*,
   325 F.3d 520 (4th Cir. 2003) ............................14

*Lane v. Celotex Corp.*,
   782 F.2d 1526 (11th Cir. 1986) ..........................27

*Maciariello v. Sumner*,
   973 F.2d 295 (4th Cir. 1992) ............................14

*Mitchael v. Intraporp, Inc.,*
    179 F.3d 847 (10th Cir. 1999) ............................26

*Mitchell v. Forsyth,*
    472 U.S. 511 (1985).................................1, 14

*Ortiz v. Jordan,*
    ___ U.S. ___, 131 S. Ct. 884 (2011).........................1

*Pearson v. Callahan,*
    555 U.S. 223 (2009).................................14, 20

*Pena v. Porter,*
    316 Fed. App'x 303 (4th Cir. 2009) ...........16, 17, 18, 19

*Perma Research & Dev. Co. v. Singer Co.,*
    410 F.2d 572 (2d Cir. 1969)...............................28

*Rohrbough v. Wyeth Labs., Inc.,*
    916 F.2d 970 (4th Cir. 1990) ............................26

*Rowland v. Perry,*
    41 F.3d 167 (4th Cir. 1994) ..........................16, 30

*Shaw v. Stroud,*
    13 F.3d 791 (4th Cir. 1994) ............................13

*Shockley v. City of Newport News,*
    997 F.2d 18 (4th Cir. 1993) ..........................12, 28

*Sigman v. Town of Chapel Hill,*
    161 F.3d 782 (4th Cir. 1998) ............................18

*Tennessee v. Garner,*
    471 U.S. 1 (1985).................................15, 16, 20

*Wilcox v. City of Asheville,*
    730 S.E.2d 226 (N.C. Ct. App. 2012).......................30

*Winfield v. Bass,*
    106 F.3d 525 (4th Cir. 1997) .............................1

**STATUTES**

28 U.S.C. § 1291...............................................1

42 U.S.C. § 1983..........................................13, 30

**CONSTITUTIONAL PROVISION**

U.S. Const. amend. IV.......................................*passim*

**RULES**

Fed. R. Civ. P. 5.2(a)......................................3

Fed. R. Civ. P. 5.2(h)......................................3

Fed. R. App. P. 25(a)(5)....................................3

## STATEMENT OF JURISDICTION

The Plaintiff-Appellee Kimberly Sipes disagrees with the Defendant-Appellant Johnny Cooper's blanket assertion that jurisdiction exists over the district court's denial of summary judgment under 28 U.S.C. § 1291. A district court's denial of summary judgment on a claim of qualified immunity is a final, appealable decision only to the extent it turns on an issue of law. *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985). A district court's determination that a there is a genuine issue of material fact is not a final decision subject to appeal. *Johnson v. Jones*, 515 U.S. 304, 313 (1995); *Ortiz v. Jordan*, ___ U.S. ___, 131 S. Ct. 884, 891 (2011).

This Court has jurisdiction over a claim that Defendant did not violate clearly established law, when accepting the facts in the light most favorable to the non-moving party and as the district court viewed them, but this Court should not exercise jurisdiction over an appeal arguing that Plaintiff has not presented enough evidence to prove that her version of the events actually occurred. *Winfield v. Bass*, 106 F.3d 525, 529-530 (4th Cir. 1997). To the extent Defendant argues his version of the facts and does not accept the facts of record in the light most favorable to Plaintiff and as found by the district court (*see* Appellant's Brief at 3-15, 21-30 and *infra* at 3-10),

1

Defendant defeats jurisdiction and his appeal should be dismissed. *See Johnson*, 515 U.S. at 313.

<u>**STATEMENT OF THE ISSUES**</u>

1.   Is Officer Cooper entitled to qualified immunity to shield him from liability for fatally shooting Michael Sipes six times in the course of responding to a non-violent noise complaint late at night, where Cooper refused to identify himself when asked repeatedly, then concealed his presence when Michael answered the door, simply because Cooper saw Michael holding a .22 rifle in a hunter's rest position under his left arm, with his hands and fingers not in or near the trigger guard, and with the barrel pointed downward and outward and away from Cooper's position?

2.   Should this Court consider Appellant's evidentiary argument that the district court improperly considered declarations in order to find an issue of material fact when in fact the district court neither made such a ruling nor relied on the declarations?

3.   If the Court determines it must reconsider the district court's evidentiary rulings, should this Court apply the "sham affidavit" doctrine to the declarations of party Kimberly Sipes and witnesses Betty Stewart and Jeremy Hastings, when Sipes declaration does not contradict her previous deposition testimony and when the fact-intensive declarations of

disinterested witnesses Betty Stewart and Jeremy Hastings contradict an earlier declaration but not any sworn prior testimony the equivalent of deposition testimony?

4.    If this Court decides that qualified immunity does not shield Officer Cooper, should the Court also find that Officer Cooper is not entitled to public officer immunity given that here, the analysis of public officer's immunity is functionally identical to the analysis of qualified immunity?

## STATEMENT OF THE CASE

In the summer of 2010, Kimberly Sipes and her 17 year-old son, Michael[1], lived in a trailer just off Air Park Drive, in Morganton, North Carolina, together with Megan Melott, her boyfriend, Cory Forney, and their three small children. (JA 115:1-24; 478, ¶ 1-2).

On the evening of August 20, 2010, Kimberly's elderly neighbor, Betty Stewart, called the Morganton Public Safety Department (MPSD) to complain about the noise from the Sipes' trailer. (JA 128:22-129:3). Sometime after 10:30 PM, Kimberly and Michael were in their living room when they heard a knock on the door. (JA 478-479, ¶ 2, 4). Kimberly asked "who is it?" The voice on the other side of the door responded in a normal tone of voice, "Morganton Public Safety Department." (JA 479, ¶ 5-6).

---

[1] Plaintiff-Appellee waives the privacy protections of Fed. R. Civ. P. 5.2(a) in accordance with Fed. R. Civ. P. 5.2(h) and Fed. R. App. P. 25(a)(5).

Though Michael's first gun, a .22 rifle bought that June, was propped in the far corner of the living room, he made no move to retrieve it. (JA 119:20-120:3; 479-480, ¶ 13-14). Kimberly opened the door and saw two uniformed police officers. (JA 479, ¶ 7). One officer stood in the doorway, while the other stood just to her left, at the bottom of her front stoop. (JA 479, ¶ 7).  Further to her left, Kimberly could see a marked police cruiser in the driveway adjacent to her trailer. (JA 479, ¶ 9).

The police officers told Kimberly and Michael, standing in the open door, they had received a noise complaint. (JA 479, ¶ 10).Kimberly apologized to the officers for the noise and explained that several small children were living in the trailer. (JA 479, ¶ 11).Kimberly promised to quiet the children down and even invited the officers into her trailer, though they politely declined. (JA 479, ¶ 11).Kimberly thanked the officers for their understanding and the officers thanked Kimberly and Michael for their cooperation and left. (JA 479, ¶ 12). Though Michael Sipes did not speak directly to the officers, he was at all times polite and respectful in their presence. (JA 479, ¶ 13).

Nine days later, Michael was playing "Spiderman" with Megan Mellott's four-year-old son inside the trailer. (JA 131:4-7). The noise could be heard 30 feet away, through neighbor Betty Stewart's open window. (JA 178:20-179:12; 198:15-16). Mrs.

4

Stewart decided again to call the police to complain about the noise and dialed the department's general telephone number, not the "911" emergency number. (JA 178: 25-179:2, 195:1-10). The dispatcher asked Mrs. Stewart whether the disturbance was "violent or non-violent" and Mrs. Stewart replied emphatically that it was non-violent – a noise made by children playing. (JA 195:1-10). Mrs. Stewart later recounted: "I made it very clear, I said it was a non-violent situation," and that she had heard "a child running up and down the trailer, hitting the walls, bouncing a ball off the walls, something like that." (JA 195:8-10, 179:21-180:1).

Officers Cooper and Ferraro of the MPSD responded. By the time they turned onto Airpark Drive in separate vehicles, it was after 11 PM and the neighborhood, including the Sipes home, was quiet. (JA 155:4-10; 199:2-4; 392:19-23). Neither officer decided to use their blue lights or sirens. (JA 265:17-19; 391:15-18). Though responding to a simple, non-violent noise complaint, both officers turned off their headlights as they entered the neighborhood. (JA 329:10-15). Rather than park their cars in plain-view of the Sipes' trailer, as officers had done nine days earlier, Cooper and Ferraro parked their vehicles down the hill from the Sipes home and behind some bushes near the park's entrance, out-of-sight of the Sipes' trailer, and continued toward the trailer on foot. (JA 209:12-21; 479, ¶ 9).

5

Officer Ferraro decided to circle toward the back of the trailer, in case anyone attempted to "flee out the back" or "should they try to shoot out the window." (JA 271:9-22).

Inside the trailer, Kimberly sat on her living room couch, cradling Megan's four-month-old infant. Michael sat on a love seat across from his mother and next to the front door. (JA 155:8-14). Blankets covered all the windows to keep the sun from heating the trailer during the day. (JA 132:7-8). Megan Mellott and Corey Forney were in the back bedroom, putting their other two children to bed. (JA 131:4-5).

Cooper banged on the Sipes' front door with his four-cell Maglite flashlight, four to six times. (JA 132:19-21; 272:4-24). When Kimberly and Michael heard the "loud sudden pounding knocks," Kimberly put her hand over the baby's ears and asked in "a pretty loud voice" who was there, but there was no response. (JA 155:21-156:12). Michael then went to the door, cupped his hands around his mouth and against the door jamb, and asked a second time, in a very loud voice "who is it?" Again, there was no response. (JA 133:9-10; 158:9-156:4). In her trailer beside and immediately behind the Sipes home, Betty Stewart had her window open and her air conditioning off, and could hear the knocks on Sipes' front door. (JA 181:2-182:18). She then heard someone inside the trailer say something – she couldn't make out

exactly what- but she heard no response from Cooper to the voices inside the trailer. (JA 181:2-182:20).

Meanwhile, when Michael heard no response to the second request for the person knocking to identify himself, he went to the corner of the living room, retrieved his .22 rifle, removed its trigger lock, and approached the front door. (JA 136:14-15; 159:5-16). He then set the .22 on the floor, leaning it against the wall between the love seat and the front door while he unchained the safety lock and then unlocked the door knob. (JA 159:18-160:11). Michael then nudged the trailer's windowless front door open with his right foot and called out loudly, through the open front door, the third request for the person outside to identify himself: "[n]ow I said, who the hell is it?" Yet again, there was no response. (JA 160: 6-13; 480, ¶ 20). Michael then picked up the .22, holding it in his right hand by the top of its barrel and above the trigger guard, pointed straight up. (JA 160:14-161:21).

As the metal trailer door slowly opened from left to right, Officer Cooper moved with the door to remain hidden behind it. (JA 331:12-14; 410:11-412:3). The door came to rest "[a] little more than halfway open." (JA 480, ¶ 20). Cooper remained silent and on the other side of the door, with his back flush against the trailer, making it impossible for Michael to see Cooper.(JA 411:7-24; 480, ¶ 20-21).

Not seeing anyone, Michael took a step out onto his front porch and looked to his left, away from the open door. (JA 161:22-24). Where nine days earlier there had been a marked police cruiser in the driveway, an officer on the porch and one at the base of the steps, there was nothing. (JA 162:1-4; 479, ¶ 7-9). Kimberly, still seated on her couch five to six feet away, could see Michael clearly as he looked left, nothing but "air" between her and her son.  Kimberly observed from Michael's face and demeanor that he saw nothing unusual. (JA 161:12-16; 162:1-4).

She watched as Michael then looked forward, again seeing nothing. (JA 162:3-4). Then she watched Michael switch the .22 from his right to his left hand and position it in a "hunter's rest," with the butt stock wedged under his left armpit and the barrel pointed downward and outward, resting on top of his left forearm, as in the photograph attached to her declaration. (JA 162:13-163:7; 482). As anyone who has ever carried a rifle in a hunter's rest knows and as Kimberly Sipes observed, Michael's fingers were not in or near the .22's trigger or trigger guard area, but sticking out to the right, beyond and away from the stock and the barrel. (JA 482).

Michael, standing to the left of the open door and facing forward,  leaned forward, placing his right hand on the porch rail.  Behind the door, Cooper was still hidden, but now

crouched in a firing position, holding his Glock pistol with both hands and his finger inside the Glock's trigger guard. As Michael leaned forward, Kimberly Sipes saw the golden muzzle flashes of Cooper's Glock and heard him fire what turned out to be eight forty-caliber rounds at Michael in rapid succession, from a distance of about three feet. (JA 163:8-10; 419:13-420:2; 428:24-429:3, 432:1-433:18; 436:4-17; 481 ¶ 21-24). Cooper never spoke before firing. Cooper admits that Michael's weapon was not pointed at him when he opened fire. (JA 170:12-171:2; 431:20-23).

The pathologist did not determine the sequence of the shots that hit Michael. (JA 489). One round went through Michael's right pinkie finger. (JA 491). Another round entered and exited through Michael's anterior right abdomen. (JA 489-490). Three additional rounds pierced his left abdomen, their paths intersecting until one bullet lodged in his right lung, another in his peritoneal cavity and a third exited his body. (JA 489-491). As Cooper continued to fire, the force of his bullets spun Michael around and off the far left side of the porch, as at least one bullet entered his buttocks and possibly his back. (JA 332:24-333:1; 449:4-10; 489-491). At least one round also struck Michael's .22, traveling through the butt and cracking the stock through the trigger mechanism. (JA 496-509). Cooper fired

another round into the trailer's wall, and which lodged in the living room floor. (JA 495).

Michael crawled a short distance across the yard before he collapsed, face-down, near the trailer's corner. (JA 279:24-280:17). Cooper attempted to handcuff Michael, but quickly realized handcuffs were unnecessary, as Michael was dying. (JA 333:5-9). Shortly afterwards, Kimberly knelt down to pray beside her son, her hands on his back, as she "felt him take his last breath." (JA 144:21-22; 169:10-21).

Ms. Sipes timely filed a wrongful death action against Cooper, Ferraro and the City of Morganton. Defendants moved for summary judgment.

The district court, after finding that "many of the facts that are central to this dispute are sharply contested," properly viewed these facts in the light most favorable to the non-moving party, Plaintiff-Appellee Sipes.  The district court then found that genuine issues of material fact exist about what happened as Cooper decided to employ deadly force against Michael Sipes and about the reasonableness of Cooper's actions when viewed in light of the Plaintiff's facts.  On October 28, 2013 the district court granted summary judgment to Officer Ferraro, but found that factual disputes precluded entry of summary judgment for Cooper on grounds of qualified or state law

immunity, and denied summary judgment to the City, as well.
Cooper then filed this appeal.

## SUMMARY OF THE ARGUMENT

The district court, after finding that "many of the facts
that are central to this dispute are sharply contested,"
properly viewed these facts in the light most favorable to the
non-moving party, Plaintiff-Appellee Kimberly Sipes, and
properly found that these facts precluded summary judgment for
Office Cooper Officer Cooper is not shielded by qualified
immunity because "an officer does not possess the unfettered
authority to shoot a member of the public simply because that
person is carrying a weapon. Instead, deadly force may only be
used by a police officer when, based on a reasonable assessment,
the officer or another person is threatened with the weapon."
*Cooper v. Sheehan*, 735 F.3d 153, 159 (4th Cir. 2013). After
reviewing the record, including Kimberly Sipes' deposition, the
district court properly found facts that would enable a jury to
find that Cooper's use of deadly force against Michael was
objectively unreasonable.   "[T]he contours" of Michael's Fourth
Amendment right "to be free from deadly force when posing no
threat," were well established for more than 20 years at the
time of the shooting, *Id*. at 60.

In an effort to change the or dispute the facts found by
the district court, Appellant claims that the court erred by

refusing to apply the "sham affidavit" doctrine to the declarations of Kimberly Sipes, Betty Stewart and Jeremy Hastings, and that but for these declarations, there would be no issue of material fact. (Appellant Br. 16-17). Boiled down, Appellant's arguments about the "sham affidavit" doctrine are arguments about the sufficiency of the evidence over which this Court lacks jurisdiction. *Johnson*, 515 U.S. at 313 (1995).

Moreover, Appellant's sham affidavit arguments create a straw man – the contention that the district court relied on those declarations to create an issue of fact about whether Michael fired the .22 – and then proceed to knock him down. These arguments ignore the district court's factual findings, which do not rely on the declarations to create the issue Appellant disputes.  Instead, the district court's findings rely plainly on the sworn testimony of Kimberly Sipes at deposition. Her declaration confirms, not contradicts, her earlier testimony.

Even were this not the case the "sham affidavit" doctrine was never intended to apply to the declarations present in this record, including to the Fact-detailed testimony of disinterested witnesses whose prior testimony was never subject to cross-examination. See, *Hernandez v. Trawler Miss Vertie Mae, Inc.,* 187 F.3d 432, 438 (4th Cir. 1999); *Shockley v. City of Newport News*, 997 F.2d 18, 23 (4th Cir. 1993).

12

Finally, because the analysis of public official immunity is functionally identical to the analysis of qualified immunity in § 1983 claims, and because the district court properly denied summary judgment Officer Cooper's claims of immunity, Appellee's state law action should move forward.

**ARGUMENT**

**STATEMENT OF THE APPLICABLE STANDARD OF REVIEW**

If this Court exercises jurisdiction to review the district court's denial of qualified immunity to Appellant Cooper, that review is *de novo*. *Bailey v. Kennedy*, 349 F.3d 731, 739 (4th Cir. 2003).

Insofar as this Court considers the "sham affidavit" doctrine, it should review the district court's decision for abuse of discretion. See, *Shaw v. Stroud*, 13 F.3d 791, 804 (4th Cir. 1994) (Reviewing the district court's decision not to apply the "sham affidavit" doctrine for abuse of discretion.)

**I.  DEFENDANT COOPER IS NOT ENTITLED TO QUALIFIED IMMUNITY TO SHIELD HIM FROM LIABILITY FOR THE USE OF EXCESSIVE DEADLY FORCE.**

**a.  Overview of 1983 Claims and the Qualified Immunity Defense**

Plaintiff Kimberly Sipes alleges that Defendant Cooper's use of deadly force on Michael Sipes was excessive and unreasonable in violation of his Fourth Amendment right to be free from  unreasonable searches and seizures. 42 U.S.C. § 1983

creates a cause of action against public officials who, acting under color of state law, violate a right arising under the U.S. Constitution. When a police officer apprehends someone through force, his conduct qualifies as a seizure that is subject to the reasonableness requirement of the Fourth Amendment protection from unreasonable government searches and seizures. *See Jones v. Buchanan*, 325 F.3d 520, 527 (4th Cir. 2003); *Bailey*, 249 F.3d at 743. A qualified immunity defense to such liability, however, exists to shield officers from suit for "bad guesses in gray areas" but not when officers "transgress bright lines." *Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992); *See also Mitchell*, 472 U.S. at 526 (1985).

A court assessing whether a police officer is entitled to the qualified immunity defense employs a two-pronged analysis. The court asks: (1) whether the officer violated the victim's constitutional rights and (2) whether the officer's alleged harmful conduct was "clearly established" as unconstitutional when the incident occurred. *Pearson v. Callahan*, 555 U.S. 223, 227 (2009). The court has discretion to decide which of the two prongs should be addressed first and if the answer to either prong is no, then the officer is entitled to qualified immunity. *Id*. at 236.

The burden of proof and persuasion with respect to a claim of qualified immunity remains on the defendant official. *Bailey*, 349 F.3d at 738.

### b. Defendant Cooper is not entitled to qualified immunity because his use of excessive deadly force was objectively unreasonable and violated Plaintiff's Fourth Amendment rights.

In assessing the use of force, the Court asks "whether a reasonable officer in the same circumstances would have concluded that a threat existed justifying the particular use of force." *Elliot v. Leavitt*, 99 F.3d 640, 642 (4th Cir. 1996), citing *Graham v. Connor*, 490 U.S. 386, 397 (1989).

Determining what a reasonable officer would do requires weighing the nature of the intrusion on the individual against the countervailing governmental interest. *Id*. at 396. When police use deadly force on a suspect, their intrusion on the individual's Fourth Amendment interests is unmatched. *Tennessee v. Garner*, 471 U.S. at 11 (1985).

Deadly force is justified only when a reasonable officer has cause to believe that a suspect poses a threat of serious and immediate harm to the officer or others.    *Anderson v. Russell*, 247 F. 3d 125, 129 (4th Cir, 2001)(quoting *Garner*, 471 U.S. at 11 (1985)); *Clem v. Corbeau*, 284 F.3d 543, 550 (4th Cir. 2001). Within the context of summary judgment, the court must view the facts leading to the officer's use of deadly force and

inferences from those facts in the light most favorable to the plaintiff. *Cooper*, 735 F.3d at 156.

In deciding whether a person poses a threat of harm to officers or others, the suspect's possession of a weapon, even a firearm, is not enough to permit the use of deadly force. *Id.* at 159; *See also Pena v. Porter*, 316 Fed. App'x., 303, 310-311 (4th Cir. 2009). A police officer may use deadly force only "if the suspect *threatens* the officer with a weapon . . . and if, where feasible, some warning has been given." *Garner*, 471 U.S. at 11-12 (emphasis added). The totality of the circumstances, including the larger context leading up to the shooting, determines whether deadly force is justified. *Clem*, 284 F. 3d at 550. The objective reasonableness of the force employed should be viewed in full context, with an eye toward the proportionality of the force in light of all the circumstances; artificial divisions in the sequence of events do not aid a court's evaluation of objective reasonableness. *Rowland v. Perry*, 41 F.3d 167, 173 (4th Cir. 1994).

In this case, though Michael was holding a .22 when he came out on the porch, no reasonable officer in Cooper's position could have believed that Michael knew a police officer was outside waiting to speak with him. Any reasonable officer would also have known that banging on the front door of someone's home late at night, never identifying yourself despite repeatedly

16

being asked to do so, the concealment of himself, his partner and his vehicle from view of the person who answers your knock, could and might probably lead  that person coming out of his home armed.

Further, seeing that Michael held the .22 in the fundamentally non-threatening, hunter's rest position, with his hands away from the trigger guard and the barrel pointed down and outward and away from the trailer against whose wall that same officer crouched, behind Michael and hidden from his view, a reasonable officer would have known that Michael did not pose a threat of immediate and serious harm to the officer or anyone else simply because he was holding the rifle.

These facts, viewed in the light most favorable to Plaintiff, compel a finding that Cooper's use of excessive, deadly force was objectively unreasonable and violated Michael's constitutional right to be free of such force.

The circumstances of this case are similar to those found in *Cooper v. Sheehan*, 735 F.3d 153 (4th Cir. 2013) and *Pena v. Porter*, 316 F. App'x 303 (4th Cir. 2009), cases in which this Court concluded that police were not entitled to qualified immunity. Both *Cooper* and *Pena* involve police responding to non-violent incidents late at night. *Cooper*, 735 F.3d at 155; *Pena*, 316 Fed. App'x. at 305. In both *Cooper* and *Pena*, police knocked on the plaintiff's trailer door, but refused to identify

17

themselves as police. *Cooper*, 735 F.3d at 155; *Pena*, 316 Fed. App'x. at 307 In response, the plaintiff in both cases answered the door with long-barreled firearms pointed in a safe direction but were shot by police without warning. *Cooper*, 735 F.3d at 155-156; *Pena*, 316 Fed. App'x. at 307. Despite the same facts here, Defendant argues that other cases with far different facts should control.

Defendants rely on *Sigman v. Town of Chapel Hill*, where this Court held police were entitled to qualified immunity in shooting a belligerent man who had just slashed an officer with a knife, despite a dispute whether the man still had the knife at the time they shot him, but where the officer had every reason to believe he did. *Sigman v. Town of Chapel Hill*, 161 F. 3d 782, 784-85 (4th Cir. 1998).  Those facts are not present here. As this Court later factually distinguished *Sigmon*:

> the police [in *Sigman*] knew at the time of the shooting that the victim was drunk and enraged, had just lost his job, had been cutting himself, and had previously threatened – with a large chef's knife – his own life, his girlfriend's life, and the police present on the scene.

*Pena*, 316 Fed. App'x. at 311-312.

Equally unavailing is Defendants' reliance on *Elliot v. Leavitt*, where a suspect in police custody had been arrested and placed in the back seat of a patrol car before producing a concealed handgun and aiming it at police. *Elliot* v. Leavitt, 99

F.3d 640, 641-642 (4th Cir. 1996). Since the suspect in *Elliot* obviously knew he was in police custody, it was reasonable for the officers to believe that the suspect was pointing his handgun at police in an attempt to harm them or escape custody -- an inherently threatening gesture. *Id*. The facts here pose no such scenario.

Like the police in *Pena* and *Cooper*, no reasonable officer, given the facts viewed in the light most favorable for Plaintiff, could have believed that Michael posed a threat either to Cooper or to others. Again, any reasonable officer would know that Cooper's actions, in concealing his presence and refusing to identify himself, would have made it more likely that Michael might answer the door with a weapon.  Any reasonable officer who observed Michael after he stepped outside on the porch also would have known he was not a serious and immediate threat to anyone, when he looked and saw no one there, all the time holding his .22 in a non-threatening position,[2] not

---

[2] Officer Cooper argues that Michael "swung" or "turned" the .22 "toward" Cooper's position, but this contention is Cooper's alone. Plaintiff's evidence is that Cooper opened fire when Michael was facing forward on the porch, right hand on the rail, beginning to look right, with the .22 in a hunter's rest under his left arm, the barrel pointed downward and outward and away from the house, not toward Cooper, who was still hidden, crouched, back against the trailer's outside wall, behind Michael and to his right. (JA 140:11-14; 162:12-163:7; 411:4-14; 481, ¶21-12). Cooper's story, again, relies on his version of the facts and not on those found by the district court in the light most favorable to Sipes.

ready to fire and not pointing it anywhere other than downward
and outward and away from the house beside which Cooper was
crouched.

In these circumstances, a jury could find that Officer
Cooper's use of deadly force was objectively unreasonable and
violated Michael's Fourth Amendment rights.

> **c.    Cooper is not entitled to qualified immunity because
> the unreasonable use of deadly force was "clearly
> established" as unconstitutional at the time he
> fatally shot Michael.**

The second prong of the qualified immunity defense
determines whether the officer's alleged harmful conduct was
"clearly established" as unconstitutional when the incident
occurred. *Pearson*, 555 U.S. at 227. "A constitutional right is
'clearly established' when 'its contours [are] sufficiently
clear that a reasonable official would understand that what he
is doing violates that right.'"  *Cooper*, 735 F.3d at 158; citing
*Hope v. Pelzer*, 536 U.S. 730, 739 (2002).  Here, relying on
*Garner*, 471 U.S. at 7, the district court properly held that if
a jury found Cooper's use of deadly force unreasonable, his
actions "were clearly established to have been unconstitutional
by Supreme Court precedent predating the shooting by more than
two decades." (JA 631).  Both prongs of the qualified immunity
test would then be "satisfied." *Id*; *see also*, *Cooper*, 735 F.3d
at 160 (precedent "amply demonstrates that the contours of the

constitutional right… to be free from deadly force when posing
no threat – were clearly established."

The district court's holding that qualified immunity does
not shield Officer Cooper from responsibility for using
objectively unreasonable, deadly force, against Michael should
be upheld.

## II.  APPELLANT'S "SHAM AFFIDAVIT" ARGUMENT IS A "RED HERRING" NOT PROPERLY BEFORE THIS COURT

Appellant argues the declarations of Betty Stewart, Jeremy
Hastings and Kimberly Sipes are "sham affidavits" that the
district court improperly considered to create a genuine issue
of fact whether Michael's fired his .22 before Cooper began
firing. (Appellant Br. 16-17). Appellant's argument obfuscates
the fact that the district court never relied on any of these
declarations to create a factual issue. That fact should end the
Court's inquiry, for as explained, *supra* at 1, Appellant's
attempts to ignore the district court's findings of fact and
discredit witness testimony is an impermissible argument about
the insufficiency of the evidence, an argument over which this
Court does not exercise jurisdiction. *Johnson*, 515 U.S. at 313.
Accordingly, this Court should not even consider Appellant's
"sham affidavit" argument.

Appellant takes the district court to task for having
"erred first by holding that the rule against the submission of

sham affidavits to create issues of fact did not apply to third-party witnesses, and thus that there was a genuine issue of material fact over whether M.S. fired his rifle." (Appellant Br. 16-17). In point of fact, the district court never held anything with respect to the "sham affidavit" doctrine. (JA 636).

Instead, the district court described Defendant's "sham affidavit" argument about the Stewart and Hastings' declarations as "dubious at best," and never ruled on the doctrine's applicability because doing so was unnecessary. (JA 636). Characterizing Appellant's "sham affidavit" arguments as a "red herring" the court relied only on Kimberly Sipes' evidence, not the declarations, holding the "evidence in the light most favorable to Plaintiff comes from Kimberly," which for summary judgment "is conclusive." *Id.* This Court should decline to review the district court's factual findings on the sufficiency of the evidence. *Johnson*, 515 U.S. at 313.

## III. EVEN IF THE COURT CONSIDERS THE "SHAM AFFIDAVIT" DOCTRINE, IT HAS NO APPLICATION TO THE AFFIDAVITS AT ISSUE.

The sham affidavit doctrine precludes a party from creating a genuine issue of material fact by way of an affidavit that *contradicts* his earlier deposition testimony. *Hernandez v. Trawler Miss Vertie Mae,* 187 F.3d 432, 438 (4th Cir. 1999). The doctrine has no applicability to the affidavit of Kimberly Sipes

22

because her declaration does not contradict her earlier deposition testimony about whether Michael fired his .22.

Appellant, here attempts to gin up a contradiction where the district court found none exists.  To do so, Appellant must disregard the district court's findings of fact and mischaracterize Mrs. Sipes' testimony.  A review of Ms. Sipes' deposition, however, does not support Appellant's fact and loose interpretations of her plain words.

During cross-examination, Ms. Sipes first testified that Michael's right hand never went near the trigger guard of his .22 and that it was therefore impossible for Michael to fire it:

> Q.   And, of course, from where you were you couldn't see where his right index finger was on that rifle; could you?
>
> MR. SASSER: Objection.
>
> A.   Yes, I could.
>
> BY MR. MACLATCHIE:
>
> Q:   All right. Where was his right index finger?
>
> A.   Down beside his hand, down beside his arm. This – it was just laying over there, and I think, as a matter of fact, he had just grabbed the balcony to lean over.

(JA 140:6-14). Then, during direct examination, Ms. Sipes testified:

> Q.   Was his hand on the trigger guard?
>
> A.   No.

23

Q.   Could you see that clearly?

A.   Yes.

Q.   Did you ever see Michael's hand on the trigger guard?

A.   No.

Q.   Okay. What happened next?

A.   I seen him lean forward to look behind the door and that's when the shots were fired.

. . .

Next, Ms. Sipes testified that her view of Michael as he held the .22 was unobstructed:

BY MR. SASSER:

Q.   How far away were you from Michael?

A.   five to six feet, me to her (indicating).

Q.   Was there anything between you and Michael obstructing your vision?

A.   Air. No, nothing.

Q.   Did you say air was the only thing?

A.   Air.

(JA 161:12-18.)

And finally, Ms. Sipes plainly and simply testifies without equivocation:

Q.   Did you see – at any time did you see Michael fire his .22?

A.   No.

Q.   At any time did you hear Michael fire his .22?

24

A.   No.

Q.   Were you looking at Michael the whole time?

A.   The whole time. Very intently.

(JA 167:12-18.)

With this, Ms. Sipes' testimony puts to rest defendants' improper questioning of the district court's findings of fact that Kimberly's evidence creates the issue of fact about whether Michael fired the .22. But still not satisfied to accept the facts found by the district court, the defendants drill down on Ms. Sipes use of the word "think" in the following colloquy:

BY MR. SASSER:

Q.   Were you looking at Michael the whole time?

A.   The whole time.  Very intently.

Q.   If Michael had fired his .22, then, would you have seen it?

MR. MACLATCHIE: Objection; speculation.

BY MR. SASSER:

Q.   You may answer.  If Michael had fired his .22, would you have seen it?

MR. MACLATCHIE: Objection; speculation.

A.   I *think* I would have, yes.

 (JA 167:12-168:1).

For Defendants, eager to create a "contradiction," Ms. Sipes saying "I think" means that nothing else she's just clearly stated can be true.  Given her unequivocal testimony

about where she was looking, whether her view was clear, and what she saw and heard, Defendants' characterization of Sipes' "contradiction" grasps at straws.  Boiled down, Defendants again displays its preference for its own interpretation of the facts in lieu of the clear findings of the district court.

The "sham affidavit" doctrine does not apply to the Stewart and Hastings depositions for three independent reasons, any of which is sufficient to reject its application: (1) Ms. Stewart and Mr. Hastings declarations include detailed factual accounts that explain why their prior testimony differs from their declarations; (2) Mrs. Stewart and Mr. Hastings are not parties and are not expert witnesses, but are disinterested witnesses; (3) Mrs. Stewart's and Mr. Hastings' prior testimony is not the equivalent of deposition testimony.

First, courts that have applied the "sham affidavit" doctrine have done so only when the second, questioned affidavit was blatantly "conclusory" or "devoid of facts." See e.g., *Rohrbough v. Wyeth Labs., Inc.,* 916 F.2d 970, 976 (4th Cir. 1990) ("affidavit is very nearly entirely conclusory and devoid of specific facts to support his opinion"); *Mitchael v. Intraporp, Inc.,* 179 F.3d 847 (10th Cir. 1999) ("affidavit is unpersuasive because much of it is conclusory, vague, and/or lacking in foundation"); *Diliberti v.United States*, 817 F.2d 1259, 1263 (7th

Cir. 1987) ("little more than [a] bald assertion, entirely lacking in any recounting of specific facts.")

By contrast here, Betty Stewart's declaration incorporates a 35-page transcript wherein she gives a detailed accounting of the night Michael died as well as why her current account of events differs from her earlier declaration. (JA 203:5-17). Though Appellant labels this account incredulous, credibility is a matter for the jury. See, *Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006). Likewise, Jeremy Hastings' declaration includes a detailed explanation that what he first thought was a "lower caliber shot" he later realized was "just the report of one of the loud, high caliber shots canceling out the full sound of the report of the shot fired just after it." (JA 530 ¶ 3).

Second, the Fourth Circuit has never expanded the "sham affidavit" doctrine to encompass the affidavits of disinterested, non-expert witnesses. See, *Hernandez,* 187 F.3d at 438 ("a party cannot create a triable issue in opposition to summary judgment simply by contradicting his deposition testimony with a subsequent affidavit"). This is because disinterested witnesses have less of a reason to lie. See e.g., *Lane v. Celotex Corp.*, 782 F.2d 1526, 1530-31 (11th Cir. 1986) (the sham affidavit doctrine should not be applied to a disinterested witness's contradictory testimony because any

27

inconsistency in the testimony is more likely the result of a faulty memory than a predisposition to lie).

Third, the Fourth Circuit has never applied the "sham affidavit" doctrine where the prior testimony was not the "equivalent of deposition testimony." *Shockley v. City of Newport News*, 997 F.2d 18, 23 (4th Cir. 1993) (declining to employ the "sham affidavit" doctrine when the prior testimony was not "the equivalent of deposition testimony" because, *inter alia*, the witness was not subject to cross-examination); *see also*, *Perma Research & Dev. Co. v. Singer Co.,* 410 F.2d 572, 578 (2d Cir. 1969)(deposition testimony is more reliable than a declaration "since the deponent was either cross-examined by opposing counsel, or at least available to opposing counsel for cross-examination.") In fact, a jury could easily find that Mrs. Stewart and Mr. Hasting's later declarations are more reliable than their earlier ones because: (1) counsel for Defendants presented both witnesses with a pre-typed declaration before ever speaking with them; (2) Betty Stewart was in bed, just discharged from hospital, and understood the person who presented her with the first declaration was Plaintiff's counsel, instead of Defendants'; and (3) neither witness fully read their first declaration before signing it. (JA 191:7-192:25; 202:25-203:13; 530, ¶ 5).

By urging this Court to expand the "sham affidavit" doctrine in at least three different ways, Appellant argues for a policy where earlier declarations, not subject to cross-examination, are preferred to later ones; where the jury is prevented from deciding the declarant's veracity; and where attorneys involved in contested matters are encouraged to race to a prospective affiant's door to obtain the first declaration, no matter how inaccurate that declaration ultimately proves to be.  To expand the "sham affidavit" doctrine in this way would prevent plaintiffs with legitimate causes of action from having their day in court.

For all the foregoing reasons, should this Court decide to consider Defendants' sham affidavit arguments, it should nevertheless reject them and find that the doctrine is not applicable to the declarations of Ms. Sipes, Mrs. Stewart and Mr. Hastings.

**IV.  DEFENDANT COOPER IS NOT ENTITLED TO PUBLIC OFFICIAL IMMUNITY TO SHIELD HIM FROM VIOLATING STATE LAW.**

Public Official Immunity shields police officers from individual liability under North Carolina state law for negligently carrying out their governmental or discretionary duties, unless their actions were corrupt, malicious or outside and beyond the scope of their official authority. See *Bailey v. Kennedy*, 349 F.3d 731,742 (4th Cir. 2003). For these purposes,

"malice" exists if an officer of ordinary intelligence would have known that his actions and use of deadly force were contrary to his duty. *Id*; *See also*, *Cooper*, 735 F.3d at 160; *Wilcox v. City of Asheville*, 730 S.E.2d 226, 230 (N.C. Ct. App. 2012).

Therefore, as this Court has established, "[i]nasmuch as the analysis of public officers' immunity is functionally identical to our discussion of the Officers' entitlement to qualified immunity with respect to the § 1983 claims, the state law claims are 'subsumed within the federal excessive force claim[s] and so go forward as well.'" *Cooper*, 735 F.3d at 160 (quoting *Rowland v. Perry*, 41 F.3d 167, 174 (4th Cir. 1994)). Accordingly, just as Officer Cooper's unconstitutional use of excessive force in killing Michael precludes him from the shield of qualified immunity, it likewise preclude him from public officer immunity.

## CONCLUSION

Plaintiff-Appellee, Kimberly Sipes, respectfully requests that this Court affirm the district court's order denying Defendant-Appellant's motion for summary judgment.

## REQUEST FOR ORAL ARGUMENT

Plaintiff-Appellee, Kimberly Sipes, respectfully requests oral argument.

Respectfully submitted this 13th day of March, 2014.

THE SASSER LAW FIRM, P.A.
Attorneys for Plaintiff-Appellee

s/Charles McB. Sasser
By:  Charles McB. Sasser
1011 East Morehead Street
Charlotte, North Carolina 28204
(704) 342-4200
Bar No: 10027

**<u>CERTIFICATE OF COMPLIANCE WITH RULE 32(A)</u>**
**Certificate of Compliance with Type-Volume Limitation,**
**Typeface Requirements, and Type Style Requirements**

1.  This brief complies with the type-volume limitation of Fed.
    R. App. P. 32(a)(7)(B) because:

    this brief contains <u>6,509</u> words, excluding the parts
    of the brief exempted by Fed. R. App. P.
    32(a)(7)(B)(iii).

2.  This brief complies with the typeface requirements of Fed.
    R. App. P. 32(a)(5) and the type style requirements of Fed.
    R. App. P. 32(a)(6) because:

    this brief has been prepared in a monospaced typeface
    using <u>Microsoft Word</u> in <u>12 point Courier New</u>.

                                  /s/ Charles McB. Sasser
                                  Charles McB. Sasser

                                  *Counsel for Appellee*


Dated: March 13, 2014

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on March 13, 2014, I electronically filed the foregoing with the Clerk of Court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF users:

James P. Cooney, III
Scott D. MacLatchie
WOMBLE CARLYLE SANDRIDGE & RICE, PLLC
1 Wells Fargo Center
301 South College Street
Suite 3500
Charlotte, NC  28202
(704) 331-4980

*Counsel for Appellant*

The necessary filing and service were performed in accordance with the instructions given to me by counsel in this case.

/s/ Adrienne R. Acra-Passehl
Adrienne R. Acra-Passehl
GIBSON MOORE APPELLATE SERVICES, LLC
421 East Franklin Street
Suite 230
Richmond, VA  23219